## O'DONNELL v STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY

Docket No. 58833. Argued March 3, 1977 (Calendar No. 13).—Decided January 4, 1979. Rehearing denied 406 Mich 1103.

Gary O'Donnell died of injuries in an automobile accident while he was covered by a no-fault insurance policy issued by defendant State Farm Mutual Automobile Insurance Company. His wife, Heather E. O'Donnell, and their children brought a complaint alleging breach of the contract of insurance and challenging the constitutionality of the no-fault insurance law, 1972 PA 294, which provides for reduction of benefits paid under the policy by the amount of government benefits (Social Security survivors' benefits in this case) received by the plaintiffs. The Washtenaw Circuit Court, Ross W. Campbell, J., granted summary judgment for defendant. The Court of Appeals, V. J. Brennan and T. M. Burns, JJ. (Bashara, P.J., dissenting), reversed on the ground that the statute violates equal protection guarantees of the United States and Michigan Constitutions because persons who cannot afford to purchase private insurance coverage in addition to required no-fault auto-

REFERENCES FOR POINTS IN HEADNOTES

[1, 6, 10, 19-21, 23]New Topic Service Am Jur 2d, No-Fault Insurance § 22.
[2, 3] New Topic Service Am Jur 2d, No-Fault Insurance §§ 22, 31.
[4, 13] 16 Am Jur 2d, Constitutional Law §§ 281-283.
[5, 8] 16 Am Jur 2d, Constitutional Law § 225.
[7] New Topic Service Am Jur 2d, No-Fault Insurance § 23.
[9, 17] 16 Am Jur 2d, Constitutional Law §§ 485, 542.
   New Topic Service Am Jur 2d, No-Fault Insurance § 22.
[11, 12] 16 Am Jur 2d, Constitutional Law §§ 334, 335.
   What provisions of the Federal Constitution's Bill of Rights are applicable to the states. 23 L Ed 2d 985.
[14, 21, 22] 16 Am Jur 2d, Constitutional Law § 533.
[15] 16 Am Jur 2d, Constitutional Law §§ 172-176.
[16, 20, 23] 16 Am Jur 2d, Constitutional Law § 174.
[18] New Topic Service Am Jur 2d, No-Fault Insurance § 1.
[24] 16 Am Jur 2d, Constitutional Law § 167.
   New Topic Service Am Jur 2d, No-Fault Insurance § 22.
[25] 16 Am Jur 2d, Constitutional Law § 150.

mobile insurance will receive less in benefits than persons who
do purchase additional insurance (Docket No. 25429). Defend-
ant appeals. *Held:*

The Legislature's judgment that the recipients of private
benefits should be treated differently from the recipients of
government benefits is supported by a rational basis and should
therefore be sustained. This distinction rationally promotes the
legitimate legislative objectives of enabling persons with eco-
nomic needs or wages exceeding the maximum benefits permit-
ted under the no-fault insurance law to obtain the supplemen-
tal coverage they need and of placing the burden of such extra
coverage directly on those persons, instead of spreading it
throughout the ranks of no-fault insureds. The statute requires
a set-off of the Federal Social Security survivors' benefits re-
ceived by the plaintiffs but that set-off is not arbitrary because
the benefits are paid as a result of the same accident and
duplicate in varying degrees the no-fault benefits otherwise
due. All persons who receive redundant government survivors'
benefits arising from one accident are treated in the same way
and all are guaranteed a maximum survivors' loss benefit of
$1,000 per month for three years. The set-off provision, there-
fore, does not violate the Due Process Clause of the state or
Federal Constitutions. The Court expresses no opinion on cases
involving a set-off of other possible government benefits.

1. The proper approach for a court when confronted with an
equal protection or due process challenge to socioeconomic
legislation such as the no-fault insurance act is to restrict its
inquiry to whether any state of facts either known or which
could reasonably be assumed affords support for it. Where the
legislative judgment is supported by the facts, although such
facts may be "debatable", the legislative judgment must be
accepted.

2. The test to determine whether legislation enacted pursu-
ant to the police power comports with due process is whether
the legislation bears a reasonable relation to a permissible
legislative objective. The test to determine whether a statute
enacted pursuant to the police power comports with equal
protection is, essentially, the same. Under traditional equal
protection analysis, a legislative classification must be sus-
tained, if the classification itself is rationally related to a
legitimate governmental interest. This test recognizes and pre-
serves the constitutional principle of separation of powers,
which forms the fundamental framework of our system of
government. Its purpose is to make certain that the judiciary
does not substitute its judgment for that of the Legislature as

to what is best or what is wisest. So long as the Legislature's judgment is supported by a rational or reasonable basis, the choices made and the distinctions drawn are constitutional. In short, the Court does not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations. The Court sits to determine whether there is a rational basis for the Legislature's judgment. If there is, then that judgment must be sustained.

3. The history of the set-off provision of the no-fault insurance act indicates that the Legislature's intent was to require a set-off of those government benefits that duplicated the no-fault benefits payable because of the accident and thereby reduce or contain the cost of basic insurance. The Social Security survivors' benefits the plaintiffs received in this case duplicated the survivors' benefits they received from the decedent's no-fault insurance policy. The Federal Social Security benefits were paid as a result of the decedent's fatal automobile accident and served substantially the same purpose as the no-fault insurance benefits.

4. The set-off provision is not arbitrary and it does have a rational basis. It promotes the valid legislative objectives of insuring payment for economic loss up to $1,000 per month for three years and of attempting to reduce or contain the cost of no-fault insurance by eliminating some of the benefit duplication that would otherwise occur. The means chosen, a set-off of duplicative government benefits, is rationally related to that end. It reduces the amount that the insurance companies must pay out, making it possible for them to reduce the amount that they must charge, and it does so only in those situations where the benefits are redundant. Thus, as in the case at bar, all beneficiaries are eligible for up to $1,000 per month for three years of survivors' benefits to compensate for their loss. Social Security survivors' benefits are never interrupted. Having a rational basis, the set-off provision of the no-fault insurance act does not violate the Due Process Clause of the state or Federal Constitutions.

5. The mere fact that the Legislature has chosen to draw a distinction between government benefit recipients and private benefit recipients does not mean that the set-off provision of the no-fault insurance act violates the Equal Protection Clause. First-party no-fault automobile insurance was made compulsory. Therefore, it was important that the premiums to be charged be maintained as low as possible. Otherwise, the poor and the disadvantaged people might not be able to obtain the necessary insurance. The Legislature chose a compromise guar-

antee of 1) up to $1,000 per month survivors' loss benefits to provide adequate compensation for most people, 2) a set-off of duplicative government benefits against no-fault benefits otherwise due to make it possible for all persons needing no-fault insurance to obtain it at less cost, and 3) no set-off requirement for private health or accident insurance benefits to enable persons with need in excess of $1,000 per month to pay the premiums in full for voluntary extension of coverage. This solution promotes several valid legislative objectives. It attempts to reduce the cost of basic no-fault insurance for everyone and to make it possible for most persons to obtain most of the coverage they need.

6. It is not necessary that the Court agree with the wisdom of the judgments made by the Legislature in order to uphold this section of the act. Nor is it necessary that the supposed beneficial effects envisioned by the Legislature be verified at this time. It is precisely because regulation in the economic field often deals with long-term developments that the Court treats such legislation with great deference. In time the Legislature may decide that the benefits originally associated with the statutory set-off scheme have not materialized or that although they have materialized they are not worth the social and economic costs. The rational basis for the distinctions drawn by the Legislature between the recipients of government benefits and the recipients of private benefits—primarily the desire to make it possible for persons with requirements exceeding the benefits assured by the no-fault insurance act to obtain the extra coverage they need without burdening other no-fault insurance purchasers—requires a holding that the set-off is constitutional under the Equal Protection Clause.

7. The amendment which permits a voluntary set-off of overlapping private health or accident insurance benefits against no-fault insurance benefits in 1974 PA 72, as opposed to a mandatory set-off, is justified by the goal of making it possible for persons with greater needs to obtain coverage they require and pay reduced rates on the no-fault insurance through deductibles and exclusions approved by the Insurance Commissioner. The fact that some persons can still receive additional benefits does not mean the statute is unconstitutional. Mathematical precision is neither possible nor required. The amendment promotes the valid legislative objective of reducing duplicative benefits; the means chosen are rationally related to that end; and the distinctions drawn are supported by a rational basis. This amendment is also constitutional.

8. In this case the Legislature has statutorily declared that

the public policy of this state now favors certain set-offs to insurance recovery. The Court has no authority to invalidate that legislative decision so long as it is supported by some rational basis. The Court has no occasion, within its limited function under the Constitution, to consider whether the legitimate purposes of the Legislature might have been better served by applying the same set-off to recipients of private insurance, or to judge for itself whether the apprehensions of the Legislature were justified by the facts. If the goals sought are legitimate, and the classification adopted is rationally related to the achievement of those goals, then the action of the Legislature is not so arbitrary as to violate the Due Process Clause.

Reversed.

Justice Williams, with Justices Fitzgerald and Moody, would affirm the judgment of the Court of Appeals for these reasons:

The elimination of duplicative benefits and the maintenance or reduction of premium costs are permissible subjects of the legislative judgment. However, neither the statutory classifications drawn nor the means selected by the Legislature to effectuate its judgment in the provision of the no-fault insurance act which subtracts government benefits from the personal protection benefits otherwise payable for the injury reasonably relate to the legitimate governmental purposes of the provision. This statutory scheme, on its face, denies the plaintiffs due process and equal protection of the laws. Therefore, the insurance contract provision which implements the statutory scheme is invalid as offensive to public policy. This declaration of unconstitutionality, in the interest of justice, is given only a limited retroactive effect.

1. The trial court correctly ruled that the plaintiffs have not alleged a breach of contract because the insurance policy provided for a reduction of benefits paid to the extent of government benefits received.

2. The proscriptions of the Fourteenth Amendment apply to the actions of the state and not to merely private conduct. The Fourteenth Amendment applies to all state legislation which impairs due process or denies equal protection. It is undisputed that the basis of the provision in the insurance policy which reduces the no-fault benefits is the legislative enactment of the no-fault insurance plan. This is state action and consequently the trial court erred in failing to consider the constitutional questions raised.

3. The plaintiffs have a claim for injury which has been reduced pursuant to the no-fault act. Therefore, this is a case of

actual controversy, and they have standing to pray for declaratory relief.

4. The "traditional" due process and equal protection tests are applicable to constitutional challenges to the various statutory schemes of the no-fault act. These tests are essentially that the court must determine first whether the statute bears a reasonable relation to a permissible legislative objective, and second whether the means chosen or the classifications under the statute are rationally related to a legitimate governmental interest. The Legislature may not take a natural class of persons, split it in two, and then arbitrarily enact different rules for the treatment of the classes. However, when there is a natural difference between the situation or circumstances of the two classes, the Legislature enjoys a wide range of discretion in distinguishing, selecting, and classifying. It is sufficient if a classification is practical and not palpably arbitrary.

5. The plaintiffs in this case must bear the burden of rebutting the presumption of the statute's constitutionality. The Court has previously expressed its preference for a record based on findings of fact when considering an attack on the statutory schemes of the no-fault insurance act. However, plaintiffs may attack its constitutionality in purely legal arguments if the legislative judgment is so arbitrary and irrational as to render the legislation unconstitutional on its face.

6. The legislative purpose of enacting the set-off provision in question is to eliminate duplicate benefits for the same injury or to reduce no-fault insurance premiums. Considering the comprehensive legislative objective of the entire act, to provide victims of motor vehicle accidents assured, adequate, and prompt reparation for certain economic losses, and to reduce or contain rising premiums borne by all insureds, the purposes of this statutory scheme are an exercise of permissible legislative judgment under the police power and rationally based. However, the classification drawn by the Legislature in this provision is without the force of requisite logic. It is, therefore, unconstitutionally arbitrary and discriminatory where contributions have been made by the insured for the governmental benefits, such as Federal Social Security survivors' benefits, which are to be set off under the statutory provision, because the scheme reduces the no-fault insurance benefits by the amount of state or Federal benefits received but does not require reduction by the amount of private, collateral insurance benefits. On its face, the statutory provision violates the traditional equal protection mandates where both classes of no-fault beneficiaries receiving collateral benefits 1) pay the same

premium for the same no-fault insurance coverage, 2) receive a common premium reduction, if any, from the scheme, and 3) monetarily contributed to securing the coverage authorizing the governmental or private collateral benefits. The statutory distinction between the two classes is based solely on the source from which the collateral compensation is paid, an irrational distinction.

7. The broad statutory language of the set-off provision is lacking in due process because it is unconstitutionally overbroad and devoid of means rationally related to an otherwise legitimate legislative purpose. Although payment of both governmental and no-fault insurance benefits may be for an injury arising from a compensable automobile accident which results in economic loss to the insured, the statutory scheme also irrationally permits the set-off of government benefits which are not related to the accident, such as pension and disability plans, and veterans' benefits.

8. The provision of the no-fault automobile insurance policy which reduces the benefits to the extent of government benefits received is invalid as offensive to public policy.

9. In the interests of justice, the declaration that the set-off provision is unconstitutional must be given only limited retroactive effect to 1) this case and all lower court cases pending which had raised the issue but had not yet been decided, 2) all appropriate future cases which subsequently raise the issue, 3) cases in which a retrial on remand because of any other issue is to occur after the date of this opinion where the set-off issue has been raised, and 4) cases in which the issue has been adequately preserved which are pending on appeal or eligible for appeal after the date of this opinion.

Justice Moody agreed with the general analysis employed by Justice Williams and therefore signed his opinion. However, he reserves judgment concerning the scope of the Legislature's intent to avoid duplicative recovery and any distinction between contributive and non-contributive governmental benefits.

70 Mich App 487; 245 NW2d 801 (1976) reversed.

OPINION OF THE COURT

1. CONSTITUTIONAL LAW — NO-FAULT INSURANCE — REDUCTION OF BENEFITS — EQUAL PROTECTION.

The Legislature's judgment in the no-fault insurance act that the recipients of private health or accident benefits should be treated differently from the recipients of government benefits in reducing no-fault benefits is supported by a rational basis

and should therefore be sustained under the Equal Protection Clause; this distinction rationally promotes the legitimate legislative objectives of enabling persons with economic needs or wages exceeding the maximum benefits permitted under the no-fault insurance act to obtain the supplemental coverage they need and of placing the burden of such extra coverage directly on those persons, instead of spreading it throughout the no-fault insureds (US Const, Am XIV; Const 1963, art 1, § 2; MCL 500.3109[1]; MSA 24.13109[1]).

2. INSURANCE — NO-FAULT INSURANCE — REDUCTION OF BENEFITS — SOCIAL SECURITY.

The provision of the no-fault insurance act which reduces the benefits to the extent of government benefits which the beneficiary receives requires a set-off of Federal Social Security survivors' benefits received by the beneficiary as the result of a decedent's death in an automobile accident (MCL 500.3109[1]; MSA 24.13109[1]).

3. CONSTITUTIONAL LAW — NO-FAULT INSURANCE — REDUCTION OF BENEFITS — DUE PROCESS.

The provision of the no-fault insurance act which requires a set-off of Federal Social Security survivors' benefits against the no-fault insurance benefits paid to the beneficiary is not arbitrary because the Social Security benefits paid as a result of the same accident and duplicate in varying degrees the no-fault benefits otherwise due; all persons who receive redundant government survivors' benefits arising from one accident are treated the same and all are guaranteed a maximum survivors' loss benefit of $1000 per month for three years; therefore, the provision does not violate the Due Process Clause (US Const, Am XIV; Const 1963, art 1, § 17; MCL 500.3109[1]; MSA 24.13109[1]).

4. CONSTITUTIONAL LAW — NO-FAULT INSURANCE — DUE PROCESS — EQUAL PROTECTION.

The test to determine whether the Legislature constitutionally exercised its police power in accord with due process and equal protection in enacting a particular scheme under the no-fault insurance act is whether the legislation bears a reasonable relation to a permissible legislative objective (US Const, Am XIV; Const 1963, art 1, §§ 2, 17; 1972 PA 294).

5. CONSTITUTIONAL LAW — STATUTES — SEPARATION OF POWERS.

The judiciary may not substitute its judgment for that of the Legislature as to what is best or wisest so long as the legislative judgment is supported by a rational or reasonable basis;

this test recognizes and preserves the constitutional principle of separation of powers (Const 1963, art 3, § 2).

6. CONSTITUTIONAL LAW — NO-FAULT INSURANCE — REDUCTION OF BENEFITS — DUE PROCESS.

The Legislature's intent in providing for a reduction of no-fault insurance benefits by the amount of government benefits which the beneficiary receives was to require a set-off of those benefits that duplicated the no-fault benefits payable because of the accident and thereby reduce or contain the cost of basic insurance, a valid legislative objective, and the statutory scheme does not violate the Due Process Clause because the means chosen, a set-off of duplicative government benefits, is rationally related to that objective (US Const, Am XIV; Const 1963, art 1, § 17; MCL 500.3109[1]; MSA 24.13109[1]).

7. CONSTITUTIONAL LAW — NO-FAULT INSURANCE — REDUCTION OF BENEFITS — DUE PROCESS — EQUAL PROTECTION.

The provision of the no-fault insurance act which requires an insurer to offer, at appropriately reduced premium rates, deductibles and exclusions reasonably related to other health and accident coverage on the insured promotes the valid legislative objective of reducing duplicative benefits, the means chosen is rationally related to that end, and the distinctions drawn are supported by a rational basis; therefore the provision does not violate equal protection and due process even though some persons can still slip through the colander of the provision and receive additional benefits (MCL 500.3109a; MSA 24.13109[1]).

8. CONSTITUTIONAL LAW — NO-FAULT INSURANCE — REDUCTION OF BENEFITS — PUBLIC POLICY.

The Legislature has statutorily declared that the public policy of this state now favors certain set-offs against no-fault insurance benefits; courts have no authority to invalidate that legislative decision under the Equal Protection or Due Process Clauses so long as it is supported by some rational relation to some legitimate legislative goals (US Const, Am XIV; Const 1963, art 1, §§ 2, 17; MCL 500.3109[1]; MSA 24.13109[1]).

DISSENTING OPINION BY WILLIAMS, J.

9. CONSTITUTIONAL LAW — NO-FAULT INSURANCE — DECLARATORY JUDGMENT — STANDING.

*Plaintiffs who have a claim for injury under the no-fault insurance act and whose benefits have been reduced pursuant to that act by the amounts they received in benefits from state or*

*Federal programs have standing to seek declaratory relief on whether the statutory scheme violates the Due Process and Equal Protection Clauses of the Michigan and United States Constitutions (US Const, Am XIV; Const 1963, art 1, §§ 2, 17; MCL 500.3109; MSA 24.13109; GCR 1963, 521.1).*

10. INSURANCE — BREACH OF CONTRACT — PLEADING.

*A complaint which alleged that an insurance company did not pay the full benefits due under a no-fault automobile insurance policy did not state facts which allege a breach of contract where the insurance policy provided for a reduction in the benefits to the extent of government benefits the beneficiary received, and the benefits had been reduced by that amount (MCL 500.3109; MSA 24.13109).*

11. CONSTITUTIONAL LAW — FOURTEENTH AMENDMENT — STATE ACTION — STATUTES.

*The proscriptions of the Fourteenth Amendment apply to actions of the state and not to merely private conduct; the Fourteenth Amendment applies to all state legislation which impairs due process or denies equal protection of the laws (US Const, Am XIV).*

12. CONSTITUTIONAL LAW — FOURTEENTH AMENDMENT — STATE ACTION — NO-FAULT INSURANCE.

*A reduction of no-fault automobile insurance policy benefits by the amount a beneficiary receives in state or Federal benefits constitutes state action under the proscriptions of the Fourteenth Amendment where the reduction is based upon a legislative enactment (US Const, Am XIV; MCL 500.3109[1]; MSA 24.13109[1]).*

13. CONSTITUTIONAL LAW — NO-FAULT INSURANCE — DUE PROCESS — EQUAL PROTECTION.

*To determine whether the Legislature constitutionally exercised its police power in accord with due process and equal protection in enacting a particular scheme under the no-fault insurance act, the test is whether legislation under the police power bears a reasonable relation to a permissible legislative objective or the legislative classification is rationally related to a legitimate government interest (US Const, Am XIV; Const 1963, art 1, §§ 2, 17; 1972 PA 294).*

14. CONSTITUTIONAL LAW — CLASSIFICATION — EQUAL PROTECTION.

*The Legislature may be justified in treating two classes of persons differently where there is a natural difference between the situation or circumstances of the classes; the state enjoys a*

*wide range of discretion in distinguishing, selecting, and classifying, and it is sufficient if a classification is practical and not palpably arbitrary (US Const, Am XIV; Const 1963, art 1, § 2).*

15. CONSTITUTIONAL LAW — STATUTES — PRESUMPTION.

*Plaintiffs challenging the constitutionality of a statute must bear the burden of rebutting the presumption of constitutionality which is accorded to the legislative judgment.*

16. CONSTITUTIONAL LAW — STATUTES.

*A party challenging the legislative judgment may attack its constitutionality in purely legal arguments if the legislative judgment is so arbitrary and irrational as to render the legislation unconstitutional on its face.*

17. CONSTITUTIONAL LAW — NO-FAULT INSURANCE — REDUCTION OF BENEFITS — DUE PROCESS — EQUAL PROTECTION.

*In considering due process and equal protection challenges to the provision of the no-fault insurance act which reduces benefits by the amount the beneficiary receives in benefits from state or Federal programs, the questions are whether the plaintiffs have overcome the presumption of constitutionality by establishing through legal argument or otherwise that the evil identified by the statutory scheme is entirely without basis, and whether the statutory scheme and the classification drawn under it is reasonably related to the legislative purpose of correcting the evil (US Const, Am XIV; Const 1963, art 1, §§ 2, 17; MCL 500.3109[1]; MSA 24.13109[1]).*

18. CONSTITUTIONAL LAW — NO-FAULT INSURANCE — DUE PROCESS — EQUAL PROTECTION — LEGISLATIVE PURPOSE.

*The legislative goal of the no-fault automobile insurance system is to provide victims of motor vehicle accidents assured, adequate, and prompt reparation of certain economic losses, along with an apparent goal to reduce or contain rising levels of premiums borne by all insureds, which are permissible legislative objectives under the police power (US Const, Am XIV; Const 1963, art 1, §§ 2, 17; 1972 PA 294).*

19. CONSTITUTIONAL LAW — NO-FAULT INSURANCE — REDUCTION OF BENEFITS — DUE PROCESS — EQUAL PROTECTION — LEGISLATIVE PURPOSE.

*The legislative purpose of the provision of the no-fault insurance act which reduces benefits by the amount the beneficiary receives in benefits from state or Federal programs is to eliminate duplicate benefits or to reduce premiums, which are permissible legislative purposes under the police power and*

*rationally based (US Const, Am XIV; Const 1963, art 1, §§ 2, 17; MCL 500.3109[1]; MSA 24.13109[1]).*

20. CONSTITUTIONAL LAW — NO-FAULT INSURANCE — REDUCTION OF BENEFITS — CLASSIFICATION.

*The classification drawn by the Legislature in the provision of the no-fault insurance act which reduces benefits by the amount the beneficiary receives in benefits from state or Federal programs is without the force of requisite logic and is, therefore, unconstitutionally arbitrary and discriminatory where contributions have been made by the insured for those governmental benefits, such as Federal Social Security survivors' benefits, which are to be set off under the statutory provision (US Const, Am XIV; Const 1963, art 1, §§ 2, 17; MCL 500.3109[1]; MSA 24.13109[1]).*

21. CONSTITUTIONAL LAW — NO-FAULT INSURANCE — REDUCTION OF BENEFITS — EQUAL PROTECTION.

*The statutory scheme of the no-fault insurance act which reduces benefits by the amount the beneficiary receives in collateral benefits from state or Federal programs to which the beneficiary has contributed but which does not require reduced benefits for those entitled to private, collateral insurance benefits on its face violates the traditional equal protection mandates where both classes of no-fault insurance beneficiaries 1) pay the same premium for the same no-fault insurance coverage, 2) receive a common premium reduction, if any, from the scheme, and 3) monetarily contributed to securing the coverage authorizing the governmental or private collateral benefits; the statutory distinction between the two classes is based solely on the source from which the collateral compensation is paid, an irrational distinction (US Const, Am XIV; Const 1963, art 1, § 2; MCL 500.3109[1]; MSA 24.13109[1]).*

22. CONSTITUTIONAL LAW — CLASSIFICATION — EQUAL PROTECTION.

*Legislation which, in carrying out a public purpose for the common good, is limited by reasonable and justifiable differentiation to a distinct type or class of persons is not for that reason unconstitutional if it is germane to the object of the enactment and made uniform in its operation upon all persons of the class to which it naturally applies; but if it fails to include and affect alike all persons of the same class, and extends immunities or privileges to one portion and denies them to others of like kind, by unreasonable or arbitrary subclassification, it comes within the constitutional prohibition against class legislation (US Const, Am XIV; Const 1963, art 1, § 2).*

23. CONSTITUTIONAL LAW — NO-FAULT INSURANCE — REDUCTION OF
    BENEFITS — DUE PROCESS.

   *The statutory language of the provision of the no-fault insurance
   act which reduces benefits by the amount the beneficiary
   receives in survivors' benefits from contributory state or Fed-
   eral programs is unconstitutionally overbroad and devoid of
   means rationally related to an otherwise legitimate legislative
   purpose because, although payment of both types of benefits
   may be for an injury arising from a compensable automobile
   accident which results in economic loss to the insured, the
   statutory provision also irrationally permits the set-off of gov-
   ernment benefits which are not related to the accident, such as
   pension and disability plans, and veterans' benefits (US Const,
   Am XIV; Const 1963, art 1, § 17; MCL 500.3109[1]; MSA
   24.13109[1]).*

24. CONSTITUTIONAL LAW — NO-FAULT INSURANCE — REDUCTION OF
    BENEFITS — PUBLIC POLICY.

   *A provision of a no-fault automobile insurance policy which
   reduces the benefits to the extent of government benefits which
   the beneficiary receives is invalid as offensive to public policy
   (MCL 500.3109[1]; MSA 24.13109[1]).*

OPINION BY BLAIR MOODY, JR., J.

25. INSURANCE — NO-FAULT INSURANCE — REDUCTION OF BENEFITS —
    LEGISLATIVE PURPOSE.

   *The scope of the Legislature's intent to avoid duplicative recovery
   under the no-fault insurance act and any distinction between
   contributive and non-contributive governmental benefits ought
   to be reserved for future judgment (MCL 500.3109[1]; MSA
   24.13109[1]).*

*Calder & Kirkendall, P.C.* (by *Robert E. Loge-
man),* for plaintiffs.

*Bodman, Longley & Dahling* (by *Theodore Souris*
and *James R. Buschmann)* and *DeVine & DeVine*
(by *Allyn D. Kantor)* for defendant.

Amici Curiae:

*Foster, Swift & Collins, P.C.* (by *Webb A. Smith*

and *David W. McKeague),* for American Mutual Insurance Alliance.

*Gerald E. Mugan* and *Eugene F. Black.*

*Bush, Luce, Henderson & Bankson* for Allstate Insurance Company.

COLEMAN, J. *(to reverse).* Section 3109(1)[1] of the Michigan No-Fault Insurance Act[2] requires that the amount of benefits payable under any no-fault insurance policy must be reduced by the amount of benefits payable to a beneficiary by the state or Federal government, but it does not also require an analogous set-off of benefits payable to a beneficiary by private health or accident insurance programs, which persons may voluntarily add to the basic no-fault insurance. The principal question presented is whether § 3109(1) discriminates against the recipients of government benefits in violation of the Equal Protection Clause of the state or Federal Constitutions.[3] The Court of Appeals ruled in a 2 to 1 decision that § 3109(1) was unconstitutional.[4] We reverse the decision of the Court of Appeals. The Legislature's judgment that the recipients of private benefits should be treated differently from the recipients of government benefits is supported by a rational basis and should therefore be sustained. This distinction rationally promotes the legitimate legislative objectives of enabling persons with economic needs and/or wages exceeding the maximum benefits permitted under the No-Fault Act to obtain the supplemental coverage they need and of placing the burden of

---

[1] MCL 500.3109(1); MSA 24.13109(1).

[2] MCL 500.3101 *et seq.;* MSA 24.13101 *et seq.*

[3] Const 1963, art 1, § 2; US Const, Am XIV.

[4] 70 Mich App 487; 245 NW2d 801 (1976).

such extra coverage directly on the shoulders of those persons, instead of spreading it throughout the ranks of no-fault insureds.

A subsidiary question is whether § 3109(1) requires a set-off of Federal social security survivors' benefits such as those received by the plaintiffs as a result of decedent's death and, if so, whether this is totally arbitrary and thus violative of the Due Process Clause of the state or Federal Constitutions.[5] We conclude that § 3109(1) does require a set-off of these government benefits but is not arbitrary because the benefits are paid as a result of the same accident and duplicate in varying degrees the no-fault benefits otherwise due. All persons who receive redundant government survivors' benefits arising from one accident are treated the same and all are guaranteed a maximum survivor's loss benefit of $1000 per month for three years. It therefore does not violate the Due Process Clause of the state or Federal Constitutions.

This opinion is confined to the facts before the Court and does not purport to encompass other possible government benefits.

I

Plaintiffs' decedent was killed in an automobile accident in 1974. Plaintiffs qualified for survivors' benefits under certain subdivisions of § 202[6] of the Federal Social Security Act[7] which provide for the payment of secondary benefits to the dependents of a wage earner who is fully qualified to receive primary social security benefits at the time of

---

[5] Const 1963, art 1, § 17; US Const, Am XIV.

[6] 42 USC 402.

[7] 42 USC 401 et seq.

death.[8] Plaintiffs also qualified for survivors' bene-
fits under the no-fault insurance policy issued by
the defendant to the decedent.

Section 3109(1) of the No-Fault Act requires the
subtraction of government benefits from no-fault
benefits otherwise due:

"Benefits provided or required to be provided under
the laws of any state or the federal government shall be
subtracted from the personal protection insurance bene-
fits otherwise payable for the injury."[9]

The no-fault policy issued by the defendant to
the decedent incorporated this legislatively man-
dated provision:

"Any amount payable by the company under the
terms of this insurance shall be reduced by (a) the
amount paid, payable or required to be provided under
the laws of any state or the federal government
* * * ."[10]

Pursuant to this provision, the defendant sub-
tracted the amount of survivors' benefits payable
by the Federal government to the plaintiffs from
the amount of survivors' benefits payable under
the decedent's no-fault policy and sent the plain-
tiffs a monthly check for the difference. The actual
amount received by the plaintiffs from the Federal
government and the defendant totaled $1000 per
month, the maximum amount authorized by
§ 3108[11] of the No-Fault Act.

[8] The pleadings do not indicate the specific subdivisions of § 402
under which the plaintiffs qualified for secondary benefits. We assume
that they qualified under subdivision e, widow's benefits, and/or
subdivision g, mother's benefits.

[9] MCL 500.3109(1); MSA 24.13109(1).

[10] Appellant's appendix, p 12a.

[11] MCL 500.3108; MSA 24.13108.

Plaintiffs sued the defendant in circuit court, alleging a breach of the insurance contract and contending that § 3109(1) violated the Due Process and Equal Protection Clauses of the Michigan and United States Constitutions. The circuit court granted a defense motion for summary judgment. The plaintiffs appealed to the Court of Appeals and that Court reversed in a 2 to 1 decision, the majority declaring that § 3109(1) was unconstitutional.[12] The defendant appealed and we granted leave to appeal.[13]

## II

In *Shavers v Attorney General,* 402 Mich 554; 267 NW2d 72 (1978), Justice WILLIAMS explained the proper approach this Court must take when confronted with an equal protection or due process challenge to socioeconomic legislation such as the No-Fault Act:

"[I]n the face of a due process or equal protection challenge, 'where the legislative judgment is drawn in question', a court's inquiry 'must be restricted to the issue whether any state of facts either known or which could reasonably be assumed affords support for it'. *United States v Carolene Products Co,* 304 US 144, 154; 58 S Ct 778; 82 L Ed 1234 (1938). * * * [W]here the legislative judgment *is supported by 'any state of facts either known or which could reasonably be assumed',* although such facts may be 'debatable', the legislative judgment must be accepted. *Carolene Products Co v Thomson,* 276 Mich 172, 178; 267 NW 608 (1936)."[14]

In a footnote at the very end of this passage,

---

[12] 70 Mich App 492-500; 245 NW2d 802-806.

[13] 397 Mich 848 (1976).

[14] *Shavers, supra,* 613-614.

further guidance was offered as to the limited nature of the Court's role:

"See *Ferguson v Skrupa,* 372 US 726, 730-731; 83 S Ct 1028; 10 L Ed 2d 93 (1963), where the United States Supreme Court stated:

" '[C]ourts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws. As this Court stated in a unanimous opinion in 1941, "we are not concerned * * * with the wisdom, need, or appropriateness of the legislation." Legislative bodies have broad scope to experiment with economic problems * * * . We refuse to sit as a "super-legislature to weigh the wisdom of legislation." ' "[15]

The proper test for judging socioeconomic legislation such as the No-Fault Act was also stated in *Shavers:*

"The test to determine whether legislation enacted pursuant to the police power comports with due process is whether the legislation bears a reasonable relation to a permissible legislative objective. See *Michigan Canners v Agricultural Board,* 397 Mich 337, 343-344; 245 NW2d 1 (1976).

"The test to determine whether a statute enacted pursuant to the police power comports with equal protection is, essentially, the same. As the United States Supreme Court declared in *United States Dep't of Agriculture v Moreno,* 413 US 528, 533; 93 S Ct 2821; 37 L Ed 2d 782 (1973):

" 'Under traditional equal protection analysis, a legislative classification must be sustained, if the classification itself is rationally related to a legitimate governmental interest.' "[16]

This test recognizes and preserves the constitutional principle of separation of powers, which

---

[15] *Id.,* fn 38, p 614.
[16] *Id.,* 612-613.

forms the fundamental framework of our system of government. Its purpose is to make certain that the judiciary does not substitute its judgment for that of the Legislature as to what is best or what is wisest. So long as the Legislature's judgment is supported by a rational or reasonable basis, the choices made and the distinctions drawn are constitutional. The United States Supreme Court and our Court have instructed:

"If the classification has some 'reasonable basis', it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality'. * * * 'The problems of government are practical ones and may justify, if they do not require, rough accommodations * * * ' ".[17]

"If it be said, the law is unnecessarily severe, and may sometimes do injustice, without fault in the sufferer under it, our reply is: these are considerations that may very properly be addressed to the legislature, but not to the judiciary—they go to the expediency of the law, and not to its constitutionality."[18]

The responsibility for drawing lines in a society as complex as ours—of identifying priorities, weighing the relevant considerations and choosing between competing alternatives—is the Legislature's, not the judiciary's. Perfection is not required:

"[T]he drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one. Perfection in making the necessary classifications is neither possible nor necessary."[19]

---

[17] *Dandridge v Williams*, 397 US 471, 485; 90 S Ct 1153; 25 L Ed 2d 491 (1970), *Weinberger v Salfi*, 422 US 749, 769; 95 S Ct 2457; 45 L Ed 2d 522 (1975).

[18] *Sears v Cottrell*, 5 Mich 250, 254 (1858).

[19] *Massachusetts Board of Retirement v Murgia*, 427 US 307, 314;

Nor is it necessary that the Legislature deal with every aspect of a problem at the same time:

"[W]e are guided by the familiar principles that a 'statute is not invalid under the Constitution because it might have gone farther than it did,' * * * that a legislature need not 'strike at all evils at the same time,' * * * and that 'reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind' * * * ."[20]

In short, we do not sit "as a superlegislature to judge the wisdom or desirability of legislative policy determinations".[21] We sit as a court to determine whether there is a rational basis for the Legislature's judgment. If there is, then that judgment must be sustained:

"It is *not* this Court's role to decide whether the Legislature acted wisely or unwisely in enacting this statute. We will not substitute our own social and economic beliefs for those of the Legislature, which is elected by the people to pass laws."[22]

### III

In order to facilitate analysis of whether § 3109(1) violates the Equal Protection Clause of the state or Federal Constitutions, we will first discuss the question of whether it requires a set-off

96 S Ct 2562; 49 L Ed 2d 520 (1976), *Ohio Bureau of Employment Services v Hodory,* 431 US 471, 489; 97 S Ct 1898; 52 L Ed 2d 513 (1977).

[20] *Katzenbach v Morgan,* 384 US 641, 657; 86 S Ct 1717; 16 L Ed 2d 828 (1966), *New Orleans v Dukes,* 427 US 297, 305; 96 S Ct 2513; 49 L Ed 2d 511 (1976).

[21] *New Orleans v Dukes, supra,* 303.

[22] *McAvoy v H B Sherman Co,* 401 Mich 419, 439; 258 NW2d 414 (1977).

of the social security survivors' benefits received by the plaintiffs and, if so, whether this violates the Due Process Clause of the state or Federal Constitutions.

Section 3109(1) states:

"Benefits provided or required to be provided under the laws of any state or the federal government shall be subtracted from the personal protection insurance benefits otherwise payable for the injury."[23]

One of the most important principles of statutory interpretation is that the words of the statute should be construed in light of the Legislature's intent. See, *e.g., Moore v Dep't of Military Affairs,* 398 Mich 324; 247 NW2d 801 (1976). The history of § 3109(1) indicates that the Legislature's intent was to require a set-off of those government benefits that duplicated the no-fault benefits payable because of the accident and thereby reduce or contain the cost of basic insurance.

In a letter to the Governor from the Commissioner of Insurance analyzing a series of proposed no-fault bills introduced in 1971, none of which contained a set-off provision, the Commissioner criticized the bills because they tended to "increase the duplication and overlap between auto insurance and other insurance programs, sick leave programs and social security".[24] Subsequent bills did contain set-off provisions.[25] The final version of § 3109(1) was similar to an amendment suggested by the Commissioner.[26] According to the

---

[23] MCL 500.3109(1); MSA 24.13109(1).

[24] Gretzinger, O'Donnell v State Farm Mutual Insurance Co: *A Judicial Attempt to Amend Michigan's No-Fault Act,* 1977 DCL Rev 187, 192, fn 36.

[25] *Id.,* 192-193.

[26] *Id.,* 194.

Commissioner, the purpose of the amendment was "to provide a more complete and effective coordination of benefits between Michigan auto insurance and the benefits provided by the laws of all the states and the federal government".[27] As noted by Justice WILLIAMS in his opinion in this case, the Commissioner's comments "make clear that the purpose of the § 3109(1) statutory scheme was framed in terms of maintaining or reducing premium costs for all insureds through the elimination of duplicative benefits recovery".[28]

The survivors' benefits received by the plaintiffs pursuant to § 402 of the Federal Social Security Act duplicated the survivors' benefits they received pursuant to the decedent's no-fault insurance policy. The survivors' benefits received pursuant to the no-fault policy were paid as a result of the decedent's death and were based on § 3108 of the No-Fault Act, which states:

"Personal protection insurance benefits are payable for a survivors' loss which consists of a loss, after the date on which the deceased died, of contributions of tangible things of economic value, not including services, that dependents of the deceased at the time of his death would have received for support during their dependency from the deceased if he had not suffered the accidental bodily injury causing death * * * ."[29]

The survivors' benefits received pursuant to § 202 of the Social Security Act were likewise paid as a result of the decedent's fatal accident and served substantially the same purpose as the no-fault benefits:

[27] *Ibid.*

[28] Opinion of WILLIAMS, J., p 568, fn 13.

[29] MCL 500.3108; MSA 24.13108.

"As originally enacted in 1935, the Social Security Act authorized a monthly benefit for qualified wage earners at least 65 years old and a death benefit payable to the estate of a wage earner who died at an earlier age. 49 Stat 622-624. *In 1939 Congress created secondary benefits for wives, children, widows, and parents of wage earners.* See 53 Stat 1362, 1364-1366. *The benefits were intended to provide persons dependent on the wage earner with protection against the economic hardship occasioned by loss of the wage earner's support. Mathews v De Castro,* 429 US 181, 185-186 [97 S Ct 431; 50 L Ed 2d 389 (1976)]. Generally speaking, therefore, the categories of secondary beneficiaries were defined to include persons who were presumed to be dependent on the wage earner at the time of his death, disability, or retirement." (Emphasis added.)[30]

Thus, the benefits received by the plaintiffs from the Federal government fell within the scope of § 3109(1)'s set-off.

This set-off is not arbitrary and it does have a rational basis. It promotes the valid legislative objectives of insuring payment for economic loss up to $1000 per month for three years and of attempting to reduce or contain the cost of no-fault insurance by eliminating some of the benefit duplication that would otherwise occur. The means chosen, a set-off of duplicative government benefits, is rationally related to that end. It reduces the amount that the insurance companies must pay out, making it possible for them to reduce the amount that they must charge, and it does so only in those situations where the benefits are redundant. Thus, as in the case at bar, all beneficiaries are eligible for up to $1000 per month for three years of survivors' benefits to compensate for their loss. Social security survivors' benefits are never interrupted. Having a rational basis, § 3109(1) does

---

[30] *Califano v Jobst,* 434 US 47, 50; 98 S Ct 95; 54 L Ed 2d 228 (1977).

not violate the Due Process Clause of the state or Federal Constitutions.

## IV

The remaining question is whether § 3109(1) discriminates against the recipients of government benefits in violation of the Equal Protection Clause of the state or Federal Constitutions.

It is undisputed that § 3109(1) treats the recipients of government benefits differently than it treats the recipients of private health or accident insurance benefits. It does not require that private benefits be set off against no-fault benefits otherwise due. Unlike the government benefit recipient, the recipient of private benefits can receive full no-fault survivors' benefits up to the maximum of $1000 per month, plus full private benefits as well.

The mere fact that the Legislature has chosen to draw a distinction between government benefit recipients and private benefit recipients does not mean that § 3109(1) is unconstitutional. If this distinction is supported by a rational basis, then it passes constitutional muster.

The Legislature had to wrestle with several competing considerations when it was deciding whether the act should contain any set-offs and, if so, what kind of set-offs it should encompass.[31] Because the first-party insurance proposed by the act was to be compulsory, it was important that the premiums to be charged by the insurance companies be maintained as low as possible. Otherwise, the poor and the disadvantaged people of the state might not be able to obtain the necessary insurance. Thus, there was a viable need for cost-

---

[31] See, generally, *A Judicial Attempt to Amend Michigan's No-Fault Act, supra,* 192-195.

cutting measures of some kind. Set-offs were one possibility. Another consideration was that the $1000 per month maximum established by § 3108 would leave many persons with economic losses and needs greater than that amount without adequate compensation. Large families would be especially hard hit by this cap on survivors' benefits. Of course, the maximum recovery could be raised to some higher amount, but this would increase the cost of the program and spread higher premiums over all purchasers.

Faced with this dilemma, the Legislature chose to experiment with a compromise solution. First, all persons would be guaranteed up to $1000 per month survivors' loss benefits under § 3108. This would provide adequate compensation for most people. Second, by virtue of § 3109(1), duplicative government benefits would be set off against no-fault benefits otherwise due. This would make it possible for all persons needing no-fault insurance to obtain it at less cost. Third, no set-off would be required for private health or accident insurance benefits. This would enable the persons with incomes or needs exceeding $1000 per month to purchase the extra coverage their families required by paying extra premiums without the hardship of (1) purchasing no-fault insurance, for the basic $1000 coverage and (2) purchasing another $1000 coverage to be set off against the basic insurance and then finally (3) purchasing whatever amount of private insurance in excess of that set-off $1000 required to cover income loss and family needs—all to be purchased with after-tax—as opposed to tax—dollars. It was finally resolved that these persons with extra needs would directly bear the burden of those needs; none of that burden would be borne by the no-fault system. The payment of extra premiums would pay in full for the

extra coverage. Therefore, there would be no discrimination in this totally voluntary option.

This solution promotes several valid legislative objectives. It attempts to reduce the cost of basic no-fault insurance for everyone and make it possible for most persons to obtain most of the coverage they need. (It could, in fact, be discriminatory to prevent it.) Section 3109(1), the means chosen by the Legislature, is, as outlined above, rationally related to these legitimate objectives.

It is not necessary that we agree with the wisdom of the judgments made by the Legislature in order to uphold this section of the act. (We may or we may not agree, but that makes no difference.) Nor is it necessary that the supposed beneficial effects envisioned by the Legislature be verified at this time. As stated just a few months ago in *Shavers* with respect to other supposed benefits of the act:

"The fact that these effects are not yet evident does not diminish the legitimacy of the goals sought to be achieved or the reasonableness of the means adopted. At this early stage in the functioning of the No-Fault Act these long-term developments cannot yet fully be assessed. Indeed, this litigation itself, with its resulting uncertainty as to the viability of the No-Fault Act, may slow the achievement of the act's goals. Our decision in *Manistee Bank [& Trust Co v McGowan,* 394 Mich 655; 232 NW2d 636 (1975)] is particularly relevant to this aspect of the case: it is precisely because regulation in the economic field often deals with long-term developments that the Court treats such legislation with great deference."[32]

In time the Legislature may decide that the benefits originally associated with § 3109(1) have

---

[32] *Shavers, supra,* 628-629.

not materialized or that although they have materialized they are not worth the social and economic costs. However, the rational basis for the distinctions drawn by the Legislature between the recipients of government benefits and the recipients of private benefits—primarily the desire to make it possible for persons with requirements exceeding the benefits assured by the No-Fault Act to obtain the extra coverage they need without burdening other no-fault insurance purchasers—requires us to hold that § 3109(1) is constitutional.

V

Section 3109(1) did not attempt to address the problem of overlapping no-fault and private health or accident insurance benefits. Soon after the No-Fault Act was passed by the Legislature, however, an attempt was made to fine-tune the set-off provisions so that this kind of duplication could be reduced while still permitting persons with needs exceeding the benefits provided by no-fault insurance to obtain the extra coverage they required. The Legislature enacted § 3109a[33] which states:

"An insurer providing personal protection insurance benefits shall offer, at appropriately reduced premium rates, deductibles and exclusions reasonably related to other health and accident coverage on the insured. The deductibles and exclusions required to be offered by this section shall be subject to prior approval by the commissioner and shall apply only to benefits payable to the person named in the policy, the spouse of the insured and any relative of either domiciled in the same household."

Although the Legislature did not choose to make

[33] MCL 500.3109a; MSA 24.13109(1).

this set-off mandatory, as it had done with § 3109(1)'s government benefit set-off, this distinction is justified by the perceived necessity of making it possible for persons with greater needs to obtain the coverage they require and pay reduced rates on the no-fault insurance through deductibles and exclusions approved by the Commissioner. That some persons can still slip through the colander of § 3109a and receive additional benefits does not mean the statute is unconstitutional. Mathematical precision is neither possible nor required.

Section 3109a promotes the valid legislative objective of reducing duplicative benefits; the means chosen is rationally related to that end; and the distinctions drawn are supported by a rational basis. This statute is also constitutional.

## VI

Our brethren have raised the specter of *Boettner v State Farm Mutual Ins Co,* 388 Mich 482; 201 NW2d 795 (1972), and *Blakeslee v Farm Bureau Mutual Ins Co,* 388 Mich 464; 201 NW2d 786 (1972), in a footnote to their opinion.[34] Neither of these cases was raised in the application for leave to appeal or briefed by any of the numerous parties who have participated in this case—and for good reason. Both are inapposite to the case. The question in each was whether certain set-off provisions created by insurance companies violated the Legislature's statutorily declared public policy in favor of full recovery. In the case at bar, the Legislature has statutorily declared that the public policy of this state now favors certain set-offs. We have no authority to invalidate that legislative

---

[34] Opinion of WILLIAMS, J., p 575, fn 20.

decision so long as it is supported by some rational basis.

## VII

In *Richardson v Belcher*, 404 US 78; 92 S Ct 254; 30 L Ed 2d 231 (1971), the United States Supreme Court was faced with a challenge to a statute similar to the challenge that we face today. The Federal Social Security Act required a set-off of workers' compensation benefits from the social security benefits otherwise due, but did not also require an analogous set-off of private benefits. The plaintiff claimed this distinction violated the equal protection guarantee implicit in the Due Process Clause of the Federal Constitution. The Court found that there was a rational basis for the distinction and affirmed the constitutionality of the set-off. The Court's closing words provide an appropriate conclusion for the case at bar:

"We have no occasion, within our limited function under the Constitution, to consider whether the legitimate purposes of Congress might have been better served by applying the same offset to recipients of private insurance, or to judge for ourselves whether the apprehensions of Congress were justified by the facts. If the goals sought are legitimate, and the classification adopted is rationally related to the achievement of those goals, then the action of Congress is not so arbitrary as to violate the Due Process Clause of the Fifth Amendment."[35]

Reverse. No costs, a public question being involved.

---

[35] *Richardson, supra,* 84.

KAVANAGH, C.J., and LEVIN and RYAN, JJ., concurred with COLEMAN, J.

WILLIAMS, J. This summary judgment case squarely raises both the facial equal protection and due process[1] viability of § 3109(1) of the No-Fault Insurance Act,[2] MCL 500.3101 *et seq.;* MSA 24.13101 *et seq.* Section 3109(1), commonly referred to as the governmental "set-off" provision, reads as follows:

"(1) Benefits provided or required to be provided under the laws of any state or the federal government shall be subtracted from the personal protection insurance benefits otherwise payable for the injury."[3] MCL 500.3109; MSA 24.13109.

A similar set-off, however, is not likewise mandated with respect to an insured's directly financed

---

[1] US Const, Am XIV; Const 1963, art 1, § 3 (equal protection); Const 1963, art 1, § 17 (due process).

[2] As indicated *infra,* plaintiffs must bear the burden of rebutting the presumption of a statute's constitutionality. That task may be accomplished by one or both of two methods: plaintiffs may either forward persuasive legal arguments indicating that the legislative judgment culminating in the enactment of the statutory scheme under § 3109(1) is unconstitutional on its face, see *Borden's Farm Products Co, Inc v Baldwin,* 293 US 194; 55 S Ct 187; 79 L Ed 281 (1934); *Pinnick v Cleary,* 360 Mass 1; 271 NE2d 592 (1971) (Tauro, C.J., concurring), or plaintiffs may offer facts justifying a judicial declaration that the scheme is equally unconstitutional, see *Borden's Farm Products Co, Inc v Baldwin,* 293 US 194; 55 S Ct 187; 79 L Ed 281 (1934); *People v Poucher,* 398 Mich 316; 247 NW2d 798 (1976). While we have expressed our preference for the latter offer in our consideration of certain constitutional attacks to other disputed no-fault statutory schemes in *Shavers v Attorney General,* 402 Mich 554; 267 NW2d 72 (1978), we have not expressed that preference in absolute terms. Indeed, we are of the opinion that in cases such as the one at bar presenting a facially unconstitutional no-fault statutory scheme, the presentation of compelling legal arguments is alone sufficient to support a judicial declaration of unconstitutionality.

[3] This set-off is made against an insured's § 3108 no-fault personal protection benefits.

private, collateral insurance benefits.[4] As Federal Social Security survivors' benefits supported by wage deductions are at issue in this case, we are not called upon to determine whether a set-off of free governmental transfer payments is constitutionally permissible.

The present controversy arose when defendant no-fault insurer sought to reduce its liability on the no-fault fund due plaintiffs, the no-fault insured's statutory dependents, by the amount of Federal Social Security survivors' benefits for which contributions had been made through Social Security wage deductions.[5]

Plaintiffs first contend that the § 3109(1) statutory scheme operates to deny equal protection of the laws to the arbitrarily drawn class of governmental benefit no-fault insureds. Distilled to its

[4] Compare MCL 500.3109a; MSA 24.13109(1) which provides in pertinent part:

"An insurer providing personal protection insurance benefits shall offer, at appropriately reduced premium rates, deductibles and exclusions reasonably related to other health and accident coverage on the insured. * * * "

[5] In *Shavers, supra,* this Court held that plaintiffs therein lacked standing under GCR 1963, 521.1 to seek declaratory relief regarding § 3109(1) because "[t]here is no proof in the record that any plaintiff had a claim for an injury which had been denied or reduced [in amount pursuant to § 3109(1)]". 402 Mich 554, 592, fn 12. Justice LEVIN similarly addressed this principle in *Advisory Opinion re: Constitutionality of 1972 PA 294,* 389 Mich 441, 484; 208 NW2d 469 (1973):

"It is not properly within our function to hypothesize particularized claims or to set up, speculatively, strawmen classes of persons who might claim to be disadvantaged in various ways by the classifications and provisions of the act."

We clearly have no such problem here. It is undisputed that plaintiffs herein "[have] a claim for an injury which [has] been * * * reduced [in amount pursuant to § 3109(1)]". The Social Security Act provides for the payment of Social Security survivors' benefits to four categories of individuals if their decedent was statutorily "insured". 42 USC 402 *et seq.* While the pleadings presented to this Court for review do not indicate under which section of the Social Security Act plaintiffs have secured their survivors' benefits, we can assume without conclusively finding that plaintiffs have been provided benefits pursuant to 42 USC 402(g) and 42 USC 402(e).

essence, plaintiffs' argument proceeds as follows. All no-fault insureds pay the same premium dollar for presumably identical no-fault coverage. No-fault insureds entitled to the receipt of certain governmental benefits, particularly Federal Social Security survivors' benefits, monetarily contribute to that governmental insurance system.[6] No-fault insureds entitled to the receipt of private, collateral insurance benefits likewise monetarily contribute to that private insurance system. Further, the nature of those injuries compensable by the governmental insurance system are frequently also compensable by funds emanating from the private insurance system. Based on these premises shared by both governmental and private, collateral insureds, plaintiffs conclude their syllogism with the contention that § 3109(1) affords these two artificially created classes of similarly situated no-fault insureds widely divergent treatment without rational basis, as the disputed statutory scheme mandates the set-off of certain collateral benefits while not requiring the set-off of other similar collateral benefits solely on the basis of the source or fund from which those benefits spring. In short, plaintiffs contend that there exists no signif-

[6] It is undisputed that plaintiffs herein, the statutory dependents of decedent no-fault insured, did not personally contribute to the Social Security fund authorizing the survivors' benefits to which they are entitled. Rather, plaintiffs collected this governmental benefit through their deceased father and husband against whom the wage deduction was levied. Under this set of facts, we are of the opinion that plaintiffs should be considered as having made the Social Security fund contribution in the same manner as we would have considered the no-fault insured decedent's contributions had he survived the automobile accident. Obviously, there is no difference in principle, insofar as contributions are concerned, between the present instance and the instance where the actual payor has not been killed in an automobile accident but personally institutes suit for disability benefits personally financed. Additionally, plaintiffs herein suffer further disparate treatment through the operation of this set-off scheme when compared with survivors of a privately insured whose benefits would not similarly be subject to set-off.

icant difference between a contributory governmental benefit program and a contributory private benefit program; both, therefore, should be treated similarly.

Formulating their analysis with reference to the traditional equal protection test, plaintiffs elaborate that there exists no rational relation between these two legislatively created classes of no-fault beneficiaries, on the one hand, and the admittedly permissible legislative purposes of duplicative benefit elimination or premium cost reduction, on the other, sufficient to constitutionally uphold the difference in treatment afforded these two similarly situated classes under this scheme. Plaintiffs allege that this conclusion is inescapable as duplicative benefit elimination is neither realized practically nor legally through the operation of § 3109(1) since the private beneficiary is permitted to retain duplicative benefits. Further, since the legislatively desired reduction in premium rates, if any, flows equally to both classes of no-fault insureds, its achievement is discriminately borne exclusively by the governmental benefit class of no-fault beneficiaries.

Plaintiffs additionally contend that § 3109(1) denies governmental benefit no-fault beneficiaries due process of law insofar as it mandates the set-off of *all* governmental benefits paid for by the recipient whether or not that benefit is casualty related as no-fault is. It is plaintiffs' position that this statutory scheme does not bear a reasonable relation to an otherwise admittedly permissible legislative purpose. For example, according to its literal language, § 3109(1) would permit the set-off of a contributory governmental longevity pension benefit against a no-fault casualty benefit which is patently not duplicative of the longevity award.

Our opinion, in its simplest form, concludes that it is neither logical nor constitutionally permissible to either eliminate benefit duplication or accomplish premium reduction by subtracting personally paid-for Social Security survivors' benefits from personally paid-for no-fault benefits while not likewise requiring a subtraction of analogous, personally paid-for private insurance benefits. We reach this conclusion on the following specific grounds: (i) § 3109(1) requires the reduction of alleged duplication in a patently discriminatory manner as it focuses its burden solely on one class of similarly situated no-fault insureds; (ii) the disputed statutory scheme operates to place the burden of commonly shared premium cost reduction, if any, on the Social Security survivor beneficiary class alone; and (iii) there exists no rational basis for subtracting paid-for *longevity* benefits from a paid-for *casualty* benefit since in no sense are such paid-for benefits duplicative. In reaching this conclusion, we are mindful that we are not dealing with the elimination of duplicative *ex gratia* governmental transfer payments.

We agree that, while a superficial distinction may exist between a contributory governmental insurance system and a contributory private insurance system, there exist no logically distinguishable characteristics relevant to the permissible legislative judgment which constitutionally justify the disparate treatment afforded those persons receiving collateral governmental benefits and those persons receiving collateral private benefits, where both classes have received a common premium reduction, if any, and both, at least in the case of Federal Social Security survivors' benefits, have made payments to secure the coverage authorizing the governmental and private benefits. See 42 USC

401. As such, the § 3109(1) statutory scheme is
facially unconstitutional insofar as it creates two
differently treated classes based solely on the
source from which the collateral compensation
emanates. We, therefore, affirm the Court of Appeals[7] reversal of the trial court's grant of summary judgment to defendant insurer with respect
to the constitutionality of this scheme.


I. Facts

Gary O'Donnell was fatally injured in an automobile collision on February 19, 1974. Plaintiffs
are the wife and children of decedent.

The decedent was insured under a "no-fault"
automobile policy issued by defendant State Farm
Mutual Automobile Insurance Company, pursuant
to the Michigan No-Fault Insurance Act, 1972 PA
294 (hereinafter referred to as the "No-Fault Act"
or "the Act").

Plaintiffs are dependents of decedent for purposes of Social Security survivors' benefits under
defendant's insurance policy as well as under
§ 3110 of the No-Fault Act.[8]

Decedent's insurance policy with defendant provided that plaintiffs, as dependents, were entitled

---

[7] *O'Donnell v State Farm Mutual Automobile Ins Co,* 70 Mich App
487; 245 NW2d 801 (1976) (Bashara, P.J., dissenting and recommending remand).

[8] Section 3110 of 1972 PA 294 provides:

"(1) The following persons are conclusively presumed to be dependents of a deceased person:

"(a) A wife is dependent on a husband with whom she lives at the
time of his death.

"(b) A husband is dependent on a wife with whom he lives at the
time of her death.

"(c) A child while under the age of 18 years, or over that age but
physically or mentally incapacitated from earning, is dependent on
the parent with whom he lives or from whom he receives support
regularly at the time of the death of the parent." MCL 500.3110; MSA
24.13110.

to recover survivors' benefits not to exceed $1,000 per 30-day period. Section 3108 of the No-Fault Act[9] provides that plaintiffs are entitled to a maximum survivors' benefits recovery of $1,000 per 30-day period for three years following decedent's death.

Decedent's insurance policy further provided, in relevant part, that:

"(5) Any amount payable by the company under the terms of this insurance shall be reduced by (a) the amount paid, payable or required to be provided under the laws of any state or federal government * * * ."

This reduction in payments mandated by paragraph (5)(a) of defendant's insurance policy is similarly mandated by § 3109(1) of the No-Fault Act, which states:

"Benefits provided or required to be provided under the laws of any state or the federal government shall be subtracted from the personal protection insurance benefits otherwise payable for the injury." MCL 500.3109(1); MSA 24.13109(1).

Plaintiffs qualified for Federal Social Security

---

[9] Section 3108 of the No-Fault Act provides:

"Personal protection insurance benefits are payable for a survivors' loss which consists of a loss, after the date on which the deceased died, of contributions of tangible things of economic value, not including services, that dependents of the deceased at the time of his death would have received for support during their dependency from the deceased if he had not suffered the accidental bodily injury causing death and expenses, not exceeding $20.00 per day, reasonably incurred by these dependents during their dependency and after the date on which the deceased died in obtaining ordinary and necessary services in lieu of those that the deceased would have performed for their benefit if he had not suffered the injury causing death. The benefits payable for survivors' loss in connection with the death of a person in a single 30-day period shall not exceed $1,000.00 and is not payable beyond the first 3 years after the date of the accident." MCL 500.3108; MSA 24.13108.

survivors' benefits totaling $556 per month. Pursuant to both paragraph (5)(a) of the insurance policy and § 3109(1) of the No-Fault Act, defendant reduced plaintiffs' $1000-maximum recoverable personal protection insurance benefits by $556 (the amount of Federal Social Security survivors' benefits owing plaintiffs) and paid plaintiffs $444 per month. During the pendency of this litigation, plaintiffs' survivors' benefits have increased approximately 35% thereby reducing defendant's no-fault liability to $243.20 per month.

Plaintiffs filed a two-count complaint in circuit court. Count I alleged that defendant had breached the insurance contract by not paying plaintiffs the full $1,000 per month in benefits. Count II requested declaratory judgment with respect to the question of whether the statutory scheme relating to § 3109 of the No-Fault Act violated the Due Process and Equal Protection Clauses of the Michigan and United States Constitutions. Plaintiffs' complaint requested declaratory relief as follows:

"a. That MCLA 500.3109 [MSA 24.13109] is a denial of due process of law as provided in the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 17 of the Michigan Constitution for the reason that said act bears no reasonable relationship to the purpose of the act and that said act deprives those who are receiving governmental benefits from receiving the no-fault benefits for which premiums were paid.

"b. That MCLA 500.3109 [MSA 24.13109] is a denial of equal protection * * * for the reasons that said act is arbitrary and discriminatory in that it creates two different classes (governmental benefit recipients and non-governmental benefit recipients) solely upon the source from which the extra compensation is paid."

Defendant moved for summary judgment on

both counts; defendant did not file supporting affidavits. The trial court properly restricted its inquiry to whether the complaint failed to state a claim upon which relief could be granted. GCR 1963, 117.2(1).

The trial court granted defendant's motion for summary judgment. The court held in its order:

"1. That count I of plaintiffs' complaint fails to state a cause of action for the reason that plaintiffs' complaint fails to state facts which allege that the defendant breached any of the provisions of said contract.

"2. That count II of plaintiffs' complaint fails to state a cause of action in that State Farm Mutual Automobile Insurance Company, in entering a contract of insurance which conforms to the requirements of the Michigan statutes, and in particular MCLA 500.3109 [MSA 24.13109], is not itself engaged in state action; consequently, any claim that the contract is itself unconstitutional is unsupportable as a matter of law."

On August 4, 1976, the Court of Appeals in separate opinions written by Judge T. M. BURNS and Judge V. J. BRENNAN (Presiding Judge BASHARA dissenting) affirmed the trial court's summary judgment as to count I and reversed the trial court's grant of summary judgment as to count II. Although referring to "a fundamental due process issue" inherent in the statutory scheme under § 3109(1), the majority opinions essentially concentrated on plaintiffs' equal protection challenge. The thrust of the Court of Appeals holding was that the classification matrix created by the statutory scheme of § 3109(1)—allowing the full receipt of both no-fault personal injury protection insurance benefits and private insurance benefits to one class of persons while deducting from the no-fault personal injury protection benefits of another class of persons any benefits received under the laws of

any state or the Federal government—did not bear a rational relationship to a "legitimate purpose" and arbitrarily discriminated "against those who receive certain governmental benefits". 70 Mich App 487, 498.

Judge BASHARA, in his dissent, would: (1) uphold the trial court's ruling as to count I of plaintiffs' complaint; (2) overrule the trial court's ruling that there was no "state action" involved in this case; and (3) hold that, with respect to the constitutional questions raised by plaintiffs, "the proper procedure is to remand to the trial judge". 70 Mich App 487, 503.

Defendant appealed the Court of Appeals decision. On August 27, 1976, this Court granted defendant leave to appeal and ordered such appeal to be submitted to this Court with *Shavers v Attorney General,* 402 Mich 554; 267 NW2d 72 (1978). In light of our detailed consideration of the no-fault insurance scheme undertaken in *Shavers,* we are now prepared to decide this case on grounds of facial unconstitutionality.

## II. GENERAL ISSUES PRESENTED

After a thorough review of the exhaustive pleadings submitted in this case, we perceive the following issues:

(1) whether the trial court erred in granting for defendant a summary judgment with respect to count I of plaintiffs' complaint (alleging that defendant had breached the insurance contract in issue by not paying to plaintiffs $1,000 per month in benefits) on the ground that "plaintiffs' complaint fails to state facts which allege that the

defendants breached any of the provisions of said contract";[10]

(2) whether the trial court erred in granting for defendant a summary judgment with respect to count II of plaintiffs' complaint (requesting declaratory judgment with respect to whether the statutory scheme established by § 3109[1] is violative of due process and equal protection) on the ground that defendant "is not itself engaged in state action";[11] and

(3) whether the trial court erred in its rationale for disposing of issue (2), *supra,* with respect to whether the statutory scheme established by § 3109(1) violates the Due Process and Equal Protection Clauses of the Michigan and United States Constitutions. More specifically, based on the facts of this case we will consider whether the § 3109(1) statutory scheme operates to deny that class which has paid for its governmental benefits, including Federal Social Security survivors' benefits, both equal protection and due process of law. We do not express any opinion with respect to the constitutionality of a set-off of non-contributory, *ex gratia* governmental transfer payments.

We answer the first issue in the negative and the latter two constitutional issues in the affirmative.

III. Breach of Contract and State Action Issues

Issues (1) and (2), *supra,* need not detain us long. As Judge Bashara stated with respect to these issues in his dissenting Court of Appeals opinion:

"I am of the opinion the trial judge correctly ruled

---

[10] Appellant's Appendix, p 14a.
[11] Appellant's Appendix, p 15a.

that count I failed to allege breach of contract. The facts pled do not allege breach of contract because the insurance contract provided for a reduction in no-fault benefits to the extent of government benefits received.

"The heart of this lawsuit is count II. The proscriptions of the Fourteenth Amendment, US Const, Am XIV, apply to actions of the state and not merely private conduct. *Shelley v Kraemer,* 334 US 1; 68 S Ct 836; 92 L Ed 1161 (1947). The Fourteenth Amendment applies to all state legislation which impairs all due process or denies equal protection. *Civil Rights Cases,* 109 US 3, 11; 3 S Ct 18; 27 L Ed 835 (1883).

"It is undisputed that the basis for paragraph (5)(a) of the insurance policy is the legislative enactment of MCLA 500.3109(1); MSA 24.13109(1). This is a state action. See *Peterson v City of Greenville,* 272 US 244; 83 S Ct 1119; 10 L Ed 2d 323 (1963). I believe the trial judge erred in determining there was no state action, and consequently failing to consider the constitutional questions raised." 70 Mich App 487, 502-503.

We are persuaded by the majority's conclusion as well as dissenting Judge BASHARA's reasoning in this regard. We specifically adopt Judge BASHARA's analysis as to issues (1) and (2) of this opinion. Accordingly, we need only further address issue (3), *supra, i.e.,* the consideration of plaintiffs' request for declaratory relief with respect to the question of whether the statutory scheme under § 3109(1) violates the Due Process and Equal Protection Clauses of the Michigan and United States Constitutions.

IV. PLAINTIFFS' CONSTITUTIONAL ATTACK ON
THE § 3109(1) STATUTORY SCHEME: THE
APPLICABLE EQUAL PROTECTION AND DUE
PROCESS TESTS

Since this final issue involves both facial due process and equal protection challenges to a statu-

tory scheme of the Michigan No-Fault Insurance
Act, our discussion in *Shavers* concerning the
appropriate constitutional standards in this area is
apposite. In *Shavers,* this Court held that the
"traditional" substantive due process and equal
protection tests espoused by this Court in its con-
sideration of other social welfare and general eco-
nomic legislation were the applicable standards by
which to consider constitutional challenges to the
various statutory schemes of the No-Fault Act. 402
Mich 554, 611-618. Manifestly, these tests must
likewise be applied in the case at bar.

We articulated the applicable "traditional" due
process test in the following terms:

"The test to determine whether legislation enacted
pursuant to the police power comports with due process
is whether the legislation bears a reasonable relation to
a permissible legislative objective." 402 Mich 554, 612.

Further, citing the United States Supreme
Court's admonitions in *United States Dep't of
Agriculture v Moreno,* 413 US 528, 533; 93 S Ct
2821; 37 L Ed 2d 782 (1973), this Court articulated
the "traditional" equal protection standard to be
applied in this area of concern. We stated:

" 'Under traditional equal protection analysis, a legis-
lative classification must be sustained, if the classifica-
tion itself is rationally related to a legitimate govern-
mental interest.' " 402 Mich 554, 613.

The details of this test were elaborated upon by
Justice RYAN in his separate opinion in *Shavers:*

"Reduced to its simplest, the equal protection guaran-
tees of both constitutions mean that the Legislature
may not take what may be termed a 'natural class of
persons', split that class in two, and then arbitrarily

designate the severed factions of the original unit as two classes and thereupon enact different rules for the treatment of each. However, when there is a natural difference between the situation or circumstances of the two classes of persons, the Legislature may be justified in treating them differently. The state enjoys a wide range of discretion in distinguishing, selecting, and classifying, and it is sufficient if a classification is practical and not palpably arbitrary. *Orient Ins Co v Daggs,* 172 US 557; 19 S Ct 281; 43 L Ed 552 (1899)." 402 Mich 554, 662.

In deference to the legislative wisdom, we made clear that in the application of these tests, "it is axiomatic that the challenged legislative judgment is accorded a presumption of constitutionality". 402 Mich 554, 613.

Recognizing that the presumption of constitutionality to be accorded judgments of the Legislature is rebuttable in nature, we indicated that:

"a party challenging the legislative judgment may attack its constitutionality in terms of purely legal arguments (if the legislative judgment is so arbitrary and irrational as to render the legislation unconstitutional on its face) * . * * ." 402 Mich 554, 614.

Cognizant of the bifurcated analytic approach and general principles established in *Shavers,* our task in deciding the constitutional questions presented herein must be as follows:

In considering plaintiffs' due process and equal protection challenges to the statutory scheme under § 3109(1), this Court must (i) determine whether plaintiffs have overcome the "presumption of constitutionality" by establishing through legal argument or otherwise that the evil identified by the statutory scheme under § 3109(1) is entirely without basis; and (ii) determine whether

either the statutory scheme or classification matrix drawn under § 3109(1) is reasonably related to the legislative purpose of correcting the evil that is rationally identified.

We are of the opinion that while the first prong of this analysis has been satisfied, the statutory scheme is deficient on its face as to the second prong, thereby rendering § 3109(1) unconstitutional on its face at least insofar as the subtraction of Federal Social Security survivors' benefits is concerned.

### V. DISCUSSION: LEGISLATIVE PURPOSE AND STATUTORY CLASSIFICATION

As indicated, *supra,* in testing both equal protection and due process attacks to statutory schemes under the No-Fault Act, the Court must first determine whether the challenged scheme has a valid legislative purpose.

In *Shavers v Attorney General, supra,* we opined that "[t]he goal of the no-fault insurance system was to provide victims of motor vehicle accidents assured, adequate, and prompt reparation for certain economic losses". 402 Mich 554, 578-579.[12] Consistent with this legislative objective was the apparent legislative determination to either reduce or contain presently rising levels of premium costs borne by all insureds.

The Court of Appeals reasoning in this case, handed down prior to our decision in *Shavers,*

---

[12] As to the Act's personal injury protection scheme, we elaborated that its "comprehensive and expeditious benefit system", was reasonably related to curing certain pronounced deficiencies of the tort liability system of recovery, including evidence that: "minor injuries were overcompensated, serious injuries were undercompensated, long payment delays were commonplace, the court system was overburdened, and those with low income and little education suffered discrimination". 402 Mich 554, 579.

implicitly recognized this comprehensive legislative judgment. Judge T. M. BURNS, writing for the majority of that Court, further discerned the purpose of § 3109(1) in the following manner:

"Presumably, the purpose of § 3109(1) is to reduce the overall cost of the no-fault program by eliminating duplicative recovery. If the insurer has to pay less, he can charge less. As recognized in *Shavers* [65 Mich App 355; 237 NW2d 325 (1975)], the reduction of the cost of insurance is a proper basis for classification, and prohibitive cost was a problem that needed solution." 70 Mich App 487, 495.

We are satisfied that the legislative objective sought to be achieved by the promulgation of the disputed statutory scheme encompasses either the objectives of duplicative benefit elimination or premium cost reduction, or both. This characterization of the disputed scheme's purpose finds support in both the legislative history of § 3109(1)[13] and the

---

[13] Michigan's No-Fault Insurance Act was signed into law by Governor Milliken on October 31, 1972. 3 Mich Senate J (1972) 2032. After two years of substantial alteration and modification undertaken by both the Michigan House of Representatives and Senate, § 3109(1) as it presently appears was adopted in that enactment.

In April of 1971, four House Bills were introduced detailing a proposed no-fault scheme of automobile insurance. 1 Mich House J (1971) 783-784. None of these bills, however, specifically provided for governmental benefit set-off. It was in response to the absence of such a provision that then-acting Commissioner of Insurance Van Hooser voiced his concern to Governor Milliken that these House Bills adversely tended to increase remedial duplication and overlap between automobile insurance benefits and other benefit programs *(e.g.,* Social Security and Medicare) receivable by an insured. In an attempt to remedy this apparently undesirable result, the Commissioner opined that the general language, "shall be payable without regard to entitlement to any other program providing wage continuation benefits", should be deleted from the bill's format. Letter from Russell E. Van Hooser, Michigan Commissioner of Insurance, to Governor Milliken (June 4, 1971) concerning analysis of House Bills 4734, 4735, 4736 and 4737, p 3 reproduced in Defendant's Exhibit No. 212, Joint Appendix submitted to this Court in *Shavers v Attorney General.* These House Bills subsequently died in committee with no action having been taken on the Commissioner's recommendation.

On April 26, 1971, the Michigan Senate introduced Senate Bill 520.

1 Mich Senate J (1971) 663. Unlike the above House drafts, § 3520, subds (A) and (B) of that bill provided for an expansive governmental benefit set-off scheme. Indeed, this bill mandated the subtraction of both public and private benefits—with the exception of Social Security benefits—from the amount otherwise payable by an insurer. Section 3520 of Senate Bill 520 provided in pertinent part:

"Sec. 3520. In Calculating Net Loss:

"(A) Except as otherwise provided in this chapter, all benefits and advantages a person receives or is entitled to receive because of an injury, from sources other than complete and added protection insurance are subracted from loss." Mich Senate Bill 520 (1971).

Commissioner Van Hooser summarized the arguments for this draft legislation, stating: "It would reduce the cost of automobile insurance. * * * It would eliminate duplication of benefits (and the resulting double premiums) by coordinating benefits from automobile insurance with all other benefits". Letter from Russell E. Van Hooser, Michigan Commissioner of Insurance to Governor Milliken (June 4, 1971), p 2 concerning analysis of Senate Bill 520 reproduced in Defendant's Exhibit No. 212, Joint Appendix submitted to this Court in *Shavers v Attorney General.*

Approximately two months after the introduction of Senate Bill 520, another bill was introduced in the Senate which directed a contrary set-off result to that expressed in Senate Bill 520. Section 9 of Senate Bill 782, 1 Mich Senate J (1971) 1000-1001, provided in pertinent part:

"Sec. 9(1). The amount of disability and survivor benefits a claimant recovers or is entitled to recover under the social security act, United States Code, title 42, sections 301 et seq., because of accidental bodily injury shall be subtracted from the personal protection insurance benefits otherwise payable for the injury." Mich Senate Bill 782 (1971).

Unlike Senate Bill 520, this set-off provision mandated payment to the insured of both personal protection insurance benefits as well as other private and public benefits with the exception of social security benefits.

Commissioner Van Hooser noted that while Senate Bill 782 "would assure prompt and adequate compensation of persons injured in auto accidents in this state for medical expenses, rehabilitation expenses, wage loss and survivor's loss", it would likewise encourage an increase in the cost of auto insurance as it failed to eliminate duplication of benefits. Letter from Commissioner Van Hooser to Governor Milliken (June 4, 1971), p 2 concerning Senate Bill 782 reproduced in Defendant's Exhibit No. 212 in *Shavers v Attorney General.* Accordingly, the Commissioner proposed an amendment to Senate Bill 782 which he determined would reduce the cost of auto insurance. Letter, p 4. The Van Hooser amendment substantially mirrored the final version of § 3109(1) as adopted.

Admittedly addressed only to Governor Milliken, Commissioner Van Hooser's comments make clear that the purpose of the § 3109(1) statutory scheme was framed in terms of maintaining or reducing premium costs for all insureds through the elimination of duplicative

majority of those cases considering the constitutionality of this scheme.[14]

Considering the comprehensive legislative objective sought to be effectuated by the promulgation of this Act, we find the purpose of the statutory scheme under consideration to be both an exercise of permissible legislative judgment and rationally based.[15] In deference to this legislative judgment, we must conclude that the first requirement of the traditional equal protection test has been fulfilled; plaintiffs have not overcome the presumption that the challenged statutory scheme has a valid legislative purpose.

Having so concluded, as did the Court of Appeals, we must now address ourselves to whether the challenged classifications and means engineered under the § 3109(1) statutory scheme are reasonably related to this legitimate governmental purpose. We conclude, as did the jurists in the analogous principal cases of *Fox v Employment Security Comm,* 379 Mich 579; 153 NW2d 644 (1967), and *Bowser v Jacobs,* 36 Mich App 320; 194 NW2d 110 (1971), that the classification matrix

___

benefits recovery. We accept the Commissioner's comments as indicative of, if not substantially mirroring, the legislative judgment in this regard. See, generally, Note, *O'Donnell v State Farm Mutual Insurance Co: A Judicial Attempt to Amend Michigan's No-Fault Act,* 1977 DCL Rev 187.

[14] *Greene v State Farm Mutual Automobile Ins Co,* 83 Mich App 505; 268 NW2d 703 (1978); *Hawkins v Auto-Owners Ins Co,* 83 Mich App 225; 268 NW2d 534 (1978); *Smart v Citizens Mutual Ins Co,* 83 Mich App 30; 268 NW2d 273 (1978); *Mielke v Michigan Millers Mutual Ins Co,* 82 Mich App 721; 267 NW2d 165 (1978); *Pollock v Frankenmuth Mutual Ins Co,* 79 Mich App 218; 261 NW2d 554 (1977); *Wysocki v Detroit Automobile Inter-Ins Exchange,* 77 Mich App 565; 258 NW2d 561 (1977).

[15] As Justice LEVIN posited for this Court in *Manistee Bank & Trust Co v McGowan,* 394 Mich 655, 680; 232 NW2d 636 (1975);

"Courts should proceed cautiously and should defer to legislative judgments which are reasonable. The Legislature must be free to experiment without being required to attain 'mathematical nicety' in its formulation of remedies to social and economic problems."

drawn by the Legislature is without the force of requisite logic and is therefore both unconstitutionally arbitrary and discriminatory where contributions have been made by the insured for those governmental benefits, including Federal Social Security survivors' benefits, sought to be set-off by § 3109(1). This conclusion is occasioned whether we perceive the purpose of the statutory scheme to be one of duplicative benefit elimination, or premium cost reduction.[16]

## VI. EQUAL PROTECTION CHALLENGE

The gravamen of plaintiff's equal protection challenge to § 3109(1) is that, while the purpose of the statutory scheme may be a permissible one, there exist no naturally distinguishable characteristics relevant to the permissible legislative judg-

[16] In its brief, defendant asserts yet a third purpose allegedly justifying the classification matrix employed by § 3109(1). Proceeding from the premise that the No-Fault Act was enacted to "achieve full compensation for all economic losses so defined and limited by the Legislature", defendant concludes that the evident purpose of § 3109(1) was designed (i) to "assure that no more and no less than actual economic loss is recovered from any source * * *" and (ii) as "[a]n ancillary effect * * * to reduce no-fault insurance carriers' exposure and, consequently, to keep the cost of no fault coverage within manageable limits". Appellant's Brief, p 18. The primary thrust of defendant's argument in this regard, therefore, is that the classifications drawn by § 3109(1) rationally promote the alleged legitimate purpose of the statutory scheme under consideration: the legislatively mandated provision of secondary rather than primary insurance coverage by economic loss. We are of the opinion that this purpose asserted by defendant was not embraced by the Legislature in view of the fact that the "subtractions" mandated by § 3109(1) include benefits enjoyed prior to the automobile casualty. Since these benefits were enjoyed wholly apart from the casualty compensable by no-fault, they could not be considered a component of the compensable economic loss resulting from the automobile casualty.

We have reviewed the legislative development of the statutory scheme under consideration as well as the No-Fault Act as a whole in our *Shavers* decision and can nowhere find support for defendant's assertion of this legislative purpose. Unpersuaded by defendant's particular characterization of the disputed scheme's purpose, we need not further address defendant's contentions in this regard.

ment which rationally justify the disparate treatment afforded these two classes. The only apparent distinction between these classes—the source of the collateral benefits—does not constitutionally justify the disparate treatment afforded those no-fault insureds receiving collateral governmental benefits and those no-fault insureds receiving collateral private insurance benefits.

On the contrary, the identity of class characteristics is patent. Both classes have received the same premium cost reduction, if any, both classes have paid the same premium dollar for identical no-fault coverage, and both, at least in the case of Social Security survivors' benefits, have made monetary contributions to secure the coverage authorizing both the governmental and private benefits. Further, plaintiffs cite persuasive legal authority in support of their contentions.

Defendants, on the other hand, allege that there exist distinguishing characteristics between governmental fund coverage and private insurance fund coverage which justify the disparate treatment afforded these two classes of no-fault recipients in furtherance of what defendant perceives to be the legislative objective of the No-Fault Act, *i.e.,* the structuring of no-fault insurance as a secondary rather than as a primary source of compensation.[17] Additionally, defendant attempts to distinguish and rebut plaintiffs' legal authority on the basis of *Richardson v Belcher,* 404 US 78; 92 S Ct 254; 30 L Ed 2d 231 (1971), attempts to factually distinguish mandatory governmental and

---

[17] Actually, it is difficult to conceive of no-fault benefits as "secondary". Since all drivers in this state are required to be covered by no-fault insurance, and since a significant fraction of these drivers are either not members of the work force from which most governmental benefits arise, or have not been in the work force long enough to be so entitled, no-fault insurance is most frequently a primary rather than a secondary source of compensation.

voluntary private insurance benefits,[18] and alleges that the amendment of the No-Fault Act with the addition of § 3109a operates to cure the disputed statutory scheme of any constitutional violations otherwise arguably involved.[19]

---

[18] Defendant cites two principal characteristics which defendant alleges distinguish governmental benefits from private insurance benefits and thereby justify the "modest difference in treatment between such benefits necessary to accomplish the Legislature's objective [of making no-fault insurance a secondary, rather than a primary, source for compensating auto crash victims for economic loss]". In brief, these two characteristics are: (i) governmental benefit programs are universal and involuntary whereas private insurance programs are not; and, (ii) benefits received from governmental programs are uniform and readily determinable while private insurance benefits are not.

Defendant's alleged distinctions justifying disparate treatment are unpersuasive. Indeed, governmental benefits are not necessarily universal as contended by defendant. For example, all no-fault insureds are not necessarily entitled to the receipt of either military benefits or even Social Security benefits although some no-fault insureds are so entitled. Further, we have found that the legislative purpose to be furthered by the disputed statutory scheme is different from that stated by defendant; defendant's distinctions are thereby rendered inapposite.

[19] Section 3109a, MCL 500.3109a; MSA 24.13109(1) provides in pertinent part:

"An insurer providing personal protection insurance benefits shall offer, at appropriately reduced premium rates, deductibles and exclusions reasonably related to other health and accident coverage on the insured. * * * "

This section of the No-Fault Act provides for an *optional* set-off of private, collateral insurance benefits at the election of the insured. In contrast, § 3109(1) provides for a *mandatory* set-off of governmental benefits whether the insured desires such a subtraction or not, and is significantly devoid of any similar provision such as "*at appropriately reduced premium rates*".

Defendant asserts that the injection of § 3109a into the composition of the general set-off scheme alleviates any constitutional infirmity of that scheme. Defendant's principal argument in this regard appears to center on the notion that, read in conjunction, §§ 3109(1) and 3109a operate to treat all no-fault insureds in an identical manner as both governmental and private, collateral benefits are confronted with a set-off. As stated by defendant in its brief at page 27:

"The only difference between government benefits and benefits from other private insurance is that government benefits are required to be subtracted from no-fault benefits while the insured has the option of electing to deduct or exclude his other private health and accident coverages or, if he be willing to bear the added cost, to receive duplicative benefits from private sources."

We cannot agree with defendant that the conjunctive consideration of § 3109a cures the equal protection deficiency of the appealed scheme by creating uniformity of treatment between governmental benefit and collateral, private benefit recipients. In fact, we are of the opinion that defendant's above-quoted statement of essential similarity between the disputed classifications bears out this very opposite point.

Indeed, rather than creating similarity between the government and private, collateral benefits classes and furthering their uniform treatment, these sections read in conjunction emphasize the arbitrary and discriminatory treatment afforded the governmental recipient class of insureds. Our conclusion first finds support in the fact that while § 3109a permits the insured to *elect* a set-off, § 3109(1) *requires* a set-off. While in many instances a set-off may be encountered in both the governmental benefit and private, collateral benefit spheres, it is not the case that such a scenario will consistently present itself under the terms of this legislation. Thus, we are still forced to deal with that situation where private insureds, not having elected a set-off, are permitted full recovery from the no-fault insurer's fund in addition to the full receipt of collateral benefits while governmental benefit recipients, not even permitted to consider a set-off, are denied full recovery from the no fault insurer's fund as that fund is merely depleted to the extent of the above-threshold governmental benefit recovery.

Second, uniformity is further dissipated by this scheme's premium reduction proviso. Section 3109a permits a reduction in full premium rates if the no-fault insured elects a set-off of collateral private benefit amounts. Section 3109(1), on the other hand, compels the insured to pay the full premium rate while concurrently acquiescing to a mandatory governmental benefit set-off. In a real sense, both classes of insureds have paid for their collateral benefits whatever form those benefits assume. Yet, those who have fortuitously engaged private, collateral benefits are permitted to recoup some of their collateral benefit costs through an appropriate premium reduction while those who have been deemed eligible for governmental assistance are denied a recoupment of some of their real out-of-pocket collateral benefit costs through an equally appropriate premium reduction. In effect, private collateral benefit insureds are permitted larger no-fault benefits for their elected full or reduced premium rate payment than are governmental benefit insureds at the mandatory full premium rate payment.

Had the Legislature chosen to offer both similarly situated classes of insureds the § 3109a set-off election with a concomitant reduction in premium rates, we might not have been compelled to consider plaintiffs' equal protection challenge. That exercise of legislative judgment, however, has not been presented for our consideration. As such, we certainly cannot agree with defendant's argument that the amendment of the No-Fault Act with the addition of § 3109a operates to breathe constitutional vitality into this otherwise expiring scheme. Rather, we are of the opinion that the juxtaposition of these provisions renders this statutory scheme facially unconstitutional in equal protection terms.

In the instant case, we are not called upon to consider whether the absence of monetary contribution by an insured to a governmental insurance system would have a favorable impact on the legislative justification for separate classification. Rather, we are here confronted with the Legislature's attempt to set off those benefits emanating from a contributory governmental scheme. Especially because of this significant distinction, we are persuaded by plaintiffs' arguments that § 3109(1) is arbitrary and discriminatory insofar as it treats similarly situated no-fault insureds differently through its creation of two distinct classes solely upon the *source* from which the extra compensation is paid.

In view of the facts here that (i) both classes of no-fault insureds pay the same premium dollar for identical maximum personal protection no-fault coverage, (ii) both classes have received a common premium cost reduction, if any, and (iii) both classes have monetarily contributed to secure the coverage authorizing both governmental and private benefits, we must find this statutory scheme facially violative of traditional equal protection mandates. Our conclusions in this regard are supported by analogous Michigan precedent: *Fox v Employment Security Comm,* 379 Mich 579; 153 NW2d 644 (1967); *Bowser v Jacobs,* 36 Mich App 320; 194 NW2d 110 (1971).[20]

---

[20] Our holding in *Boettner v State Farm Mutual Ins Co,* 388 Mich 482; 201 NW2d 795 (1972), following *Blakeslee v Farm Bureau Mutual Ins Co,* 388 Mich 464; 201 NW2d 786 (1972), while not cited by plaintiffs, provides further support for our concern that plaintiffs have been deprived of a benefit for which they have paid and to which they would otherwise be entitled. Both *Blakeslee* and *Boettner* dealt with the stacking of automobile insurance policies prior to the advent of the No-Fault Act. Neither was decided on constitutional grounds. One issue presented in both concerned whether an insured could collect on more than one auto policy for which that insured had paid despite the fact that only one covered auto had been involved in an accident.

## A. Duplicative Benefit Elimination

If the legislative purpose of the statutory scheme before us is considered to involve the elimination of duplicative recovery, it is apparent that this permissible purpose is neither practically nor constitutionally realized by the § 3109(1) classification matrix as the distinction in classes is based solely on the source from which the collateral compensation is paid.[21] Section 3109(1) irrationally permits the retention of duplicative no-fault and private insurance benefits by that class which has directly engaged such collateral, private insurance. Yet, it concurrently mandates the reduction of insurer-paid no-fault benefits by the amount of benefits likewise directly paid for by the no-fault insured yet fortuitously received under the auspices of a governmental program. We cannot sanction this irrational class differentiation.

This finding of unconstitutionally disparate classification is further emphasized when one notes that § 3109a, MCL 500.3109a; MSA 24.13109(1), provides for an optional set-off of private, collateral insurance benefits at the election of the in-

---

Citing our statement in *Blakeslee,* 388 Mich 464, 474, we expressed the following in *Boettner:*

"'It would be unconscionable to permit an insurance company offering statutorily required coverage to collect premiums for it with one hand and allow it to take the coverage away with the other by using a self-devised "other insurance" limitation.'" 388 Mich 482, 487-488.

In a real sense, the § 3109(1) statutory scheme permits an insurer to collect premiums for personal protection coverage with one hand while permitting that insurer to either completely or partially take that coverage away with the other through the guise of a governmental benefit set-off. Just as we found that practice objectionable in these stacking cases, we find them equally objectionable here.

[21] Actually, the benefits subject to subtraction under § 3109(1) may not even be duplicative. This point is illustrated in those instances, for example, where the governmental benefit sought to be subtracted does not arise from an automobile casualty at all, but rather arises from a longevity payment or a war-related disability.

sured, while § 3109(1) mandates such a set-off whether the governmental benefit recipient desires such a subtraction or not. There is no logic to support this difference in an attempt to eliminate duplicative recovery.[22]

## B. Premium Cost Reduction

Similarly, pursuant to the classifications drawn by the Legislature in enacting § 3109(1), all Michigan motorists pay the same uniform premium rate for no-fault coverage but all do not receive the same benefits. It is urged by defendant that such classifications are permissible means for achieving the lowering of premium rates. We do not agree as § 3109(1) focuses the burden of premium cost reduction on governmental benefit recipients alone. That class is confronted with a set-off while similarly situated private insureds who benefit from this premium reduction are not. This conclusion obtains whether we review § 3109(1) alone or in conjunction with § 3109a.

Section 3109a, MCL 500.3109a; MSA 24.13109(1), provides in relevant part:

> "An insurer providing personal protection insurance benefits shall offer, at appropriately reduced premium rates, deductibles and exclusions reasonably related to other health and accident coverage on the insured.
> * * * "

The effect of this section is to permit a no-fault insured who has engaged collateral, private insur-

---

[22] We note in passing that the Legislature could have constitutionally realized its otherwise permissible judgment by treating these similarly situated classes alike, mandating a set-off for both governmental and private insurance recipients. This the Legislature did not do and we therefore feel constrained to declare this classification scheme violative of equal protection.

ance to receive a reduction in premium rates if that insured has elected a set-off of private, collateral benefit amounts. Section 3109(1), on the other hand, compels an insured to pay the full premium rate while concurrently requiring acquiescence to a mandatory set-off of governmental benefits for which the insured has paid.

In a real sense, both classes of insureds have paid for their collateral benefits whatever form those benefits have assumed. Yet, those who have engaged private, collateral benefits are permitted to recoup some of their collateral benefit costs through an appropriate premium reduction pursuant to § 3109a while those who receive governmental benefits are denied a similar recoupment of some of their out-of-pocket collateral benefit costs through an equally appropriate premium reduction. In effect, private collateral benefit no-fault insureds are disproportionately permitted larger no-fault benefits for their elected full or reduced premium rate payment than are similarly situated governmental benefit recipient-insureds at the mandatory full premium rate.[23]

Further, proceeding from an analysis of § 3109(1) alone, we are similarly convinced that

[23] In view of the Legislature's apparent reluctance as expressed in § 3109a to permit a set-off of private, collateral benefits in the absence of a direct premium reduction, it might be argued that the Legislature solely mandated a set-off of governmental benefits based on the misconceived notion that governmental benefits are uniformly available to all no-fault insureds. If this erroneous conception guided the Legislature in its enactment of § 3109(1), an equally erroneous conclusion that all insureds are permissibly treated similarly through the operation of § 3109(1) would indeed arise. Our disagreement with this notion is apparent. In fact, all no-fault insureds are not uniformly eligible for governmental assistance. This becomes apparent when one considers that only four narrow classes of individuals are eligible for Federal Social Security survivors' benefits if their decedent was also statutorily "insured". 42 USC 402 *et seq.* Uniformity in treatment, therefore, is not championed by the § 3109(1) statutory scheme; rather, unconstitutionally disparate classification once again clearly emerges from this feigned veil of uniformity.

the burden of effectuating the permissible premium cost reduction objective unconstitutionally rests solely upon the governmental benefit class of no-fault insureds. Unlike the collateral private insured class, the governmental recipient insured class is first compelled to purchase no-fault insurance, denied full no-fault coverage on claims compensable by governmental programs ostensibly for the purpose of reducing premiums, and is then denied the full benefit of the savings in premiums while the similarly situated private benefit class is not. In essence, this scheme operates both arbitrarily and discriminately to compel those insureds entitled to both government and no-fault benefits to subsidize premium savings for the greater class of all insureds including those entitled to receive and hold private insurance benefits.[24]

---

[24] See *Manistee Bank & Trust Co v McGowan,* 394 Mich 655; 232 NW2d 636 (1975), wherein this Court considered the equal protection viability of the Michigan guest passenger act. The disputed act statutorily denied tort recovery to negligently injured, non-paying automobile passengers. As one possible purpose for the guest/non-guest classifications drawn by the Legislature, the Court analyzed the allegation that the disputed act was permissibly enacted to limit liability, reduce litigation, and thereby enable insurers to offer mandatory coverage at reduced premium rates. Applying the traditional "reasonable relation" equal protection test to the challenged classification matrix in this particular respect, Justice LEVIN found the statutory scheme to deny plaintiffs equal protection of the laws and stated for the majority:

"Conceding, *arguendo,* that insurance rates are lower because there is a guest statute, lower insurance premiums do not, without more, justify an essentially arbitrary classification.

"If persons injured on Thursdays or men between 50 and 60 years of age were denied recovery for ordinary negligence, there would be assurance of less litigation, fewer recoveries, and the possibility of lower insurance rates. Nevertheless, all would agree that such classifications would be struck down as 'arbitrary' despite the relief afforded 'the purse of the motor owning public'.

"It may be legitimate for the Legislature to intervene in the increasing costs of automobile insurance. But the means selected by the Legislature to do so must be reasonably related to the object sought to be attained. Denying guest passengers recovery for ordinary negligence is no more reasonably related to the objective of lower insurance rates than would be denying recovery to persons injured on Thursdays or men between 50 and 60 years of age.

## C. Equal Protection Case Analysis

We find support for our conclusion of facial unconstitutionality in the case law as developed by the courts of this state. Indeed, both this Court and the Court of Appeals have earlier been faced with equal protection challenges to analogous governmental set-off schemes; these challenges were presented in both *Fox v Employment Security Comm,* 379 Mich 579; 153 NW2d 644 (1967), and *Bowser v Jacobs,* 36 Mich App 320; 194 NW2d 110 (1971).

In *Fox,* weekly unemployment benefits were statutorily denied to those employees receiving total permanent, partial permanent, or temporary disability workers' compensation benefits. Recipients of workers' death benefits, "specific loss" benefits, and those employees who elected to accept a "lump sum" workers' compensation award, how-

"Guest passengers as a class are not better able to bear the cost of lower premiums for the motor owning public. As a class, they are not necessarily all wealthy nor do they necessarily all have especial sources of recovery. Those who do not have other sources of recovery are forced to exhaust their own resources and may become public charges." 394 Mich 655, 677-678.

Justice LEVIN further opined that it was even uncertain whether governmental efforts to reduce costs and thereby protect the public purse were sufficient justification for legislative selection of a similarly situated class for disparate treatment.

Analogous to the scenario confronted by this Court in *Manistee Bank,* this case before us involves governmental benefit recipients who pay the same premium as private insureds, suffer the same losses as private insureds, and are governed by the identical no-fault benefit scheme as private insureds. Yet, when it comes time for the no-fault insurer to compensate loss, the insurer is permitted to reduce its out-of-pocket liability with respect to governmental recipients while it must fully compensate the private insured out of the same pocket, while in both instances championing the notion that this disparate treatment is undertaken in an attempt to reduce premium costs for all insureds. Much like the constitutional plight confronted by guests in *Manistee Bank,* we can perceive no rational relationship between this class segregation and premium reduction; in fact, it appears that the governmental recipient has effectively paid a higher premium for reduced recovery.

ever, were statutorily permitted to receive weekly
unemployment compensation.

Justice T. M. KAVANAGH, writing for the major-
ity, opined that the object of the disputed statutory
scheme was to preclude the possibility of benefit
duplication; this object was identified by the Court
as a permissible legislative purpose. The distinc-
tion drawn by the Legislature between the two
classes of potential weekly unemployment compen-
sation recipients on the basis of a worker's eligibil-
ity for either permanent or temporary compensa-
tion as opposed to death benefits, "specific loss"
benefits, and "lump sum" benefits, however, was
held to be an impermissible, arbitrary classifica-
tion scheme. This was so, the Court opined, be-
cause under the statutory scheme certain workers
were permitted to obtain unemployment benefits
while others similarly situated were not. Citing
*People v Chapman,* 301 Mich 584; 4 NW2d 18
(1942), which quoted from *Haynes v Lapeer Circuit
Judge,* 201 Mich 138; 166 NW 938 (1918), the
Court stated:

" ' "Legislation which, in carrying out a public pur-
pose for the common good, is limited by reasonable and
justifiable differentiation to a distinct type or class of
persons is not for that reason unconstitutional because
class legislation, if germane to the object of the enact-
ment and made uniform in its operation upon all
persons of the class to which it naturally applies; but if
it fails to include and affect alike all persons of the
same class, and extends immunities or privileges to one
portion and denies them to others of like kind, by
unreasonable or arbitrary subclassification, it comes
within the constitutional prohibition against class
legislation." ' " 379 Mich 579, 589.

Under the auspices of the "traditional" equal pro-
tection test, the Court held that the disputed

statutory classification scheme denied plaintiffs
equal protection despite its attempt to effectuate a
permissible legislative objective of duplicative ben-
efit elimination.

While we are cognizant that *Fox* is not a direct
analogue of the present action, we believe it per-
suasively offers support for the proposition that
the classifications drawn here are violative of
equal protection. In fact, we are of the opinion
that the *Fox* Court went further than we are
presently required to proceed in finding a govern-
mental set-off scheme constitutionally infirm in
that neither the unemployment nor workers' com-
pensation beneficiaries made any financial contri-
bution for their benefit rights whereas in the
instant case the beneficiaries made contributions
for all benefit rights.

Further support for our ruling of facial unconsti-
tutionality is found in the closely analogous case of
*Bowser v Jacobs,* 36 Mich App 320; 194 NW2d 110
(1971) (now-Justice Levin, dissenting and recom-
mending remand for further findings of fact). In
*Bowser,* the Court of Appeals considered the equal
protection viability of a statutory scheme under
the Motor Vehicle Accident Claims Act. The dis-
puted scheme operated to totally bar those em-
ployees entitled to workers' compensation from
applying for benefits under that act. Those claim-
ants similarly situated, but who had nonetheless
secured voluntary collateral, private insurance,
however, were permitted recourse against the
fund. The majority agreed with the plaintiffs' con-
cern that the classification was violative of "tradi-
tional" equal protection mandates.[25] Writing for

---

[25] Other jurisdictions have similarly held such statutory schemes
reducing an insured's recovery by claims compensable under disabil-
ity benefit laws by the amount paid out of workers' compensation
funds to be invalid as contrary to public policy. See, *e.g., Allied*

the Court, Chief Judge LESINSKI stated:

"The legislative aim of this social legislation * * * is to compensate those injured by uninsured tortfeasors who would otherwise have had no source of recovery. But, as we have seen, some persons who have available avenues of recovery are permitted to reach the Fund but injured employees are not. We are constrained to agree that the legislature has arbitrarily carved out this class from those who have recourse to the Fund. This classification is one made without the force of compelling logic; we find it unconstitutionally discriminatory." 36 Mich App 320, 328.

Defendant characterizes *Bowser* as inapt on the ground that the statutory scheme presently under consideration merely mandates a set-off in recovery while the *Bowser* statutory scheme required a total bar to recovery. We do not find this distinction persuasive, especially in view of the fact that in both *Bowser* and the case at bar the concern is one of statutory classification rather than the aggregate amount of an insured's recovery. We find the basis of the *Bowser* court's reasoning appropriate for consideration in the matter before us.

Defendant's principal rebuttal to the Court of Appeals ruling of unconstitutionality rests upon the decision of the United States Supreme Court in *Richardson v Belcher,* 404 US 78; 92 S Ct 254; 30 L Ed 2d 231 (1971) (Justices Douglas, Marshall

*Mutual Ins Co v Larriva,* 19 Ariz App 385; 507 P2d 997 (1973); *Travelers Ins Co v National Farmers Union Property & Casualty Co,* 252 Ark 624; 480 SW2d 585 (1972). The Court of Appeals aptly quoted the following language from the *Travelers Insurance Co* decision:

" 'The right claimed by NFU [the insurer] would simply provide it with a windfall in the case of one covered by the workmen's compensation laws. The purpose of the Uninsured Motorist Act was to protect the insured, not the insurer.' " 70 Mich App 487, 497.

and Brennan dissenting). We find this arguable, but distinguishable and not persuasive.

The facts presented in *Richardson* required the United States Supreme Court to consider a "traditional" equal protection challenge to § 224 of the Social Security Act. The disputed statutory scheme required the set-off of state and Federal workers' compensation benefits against Federal Social Security disability benefits. Those similarly situated but entitled to voluntary, private benefits, however, were not required to maintain a similar set-off. The Supreme Court, in a 4 to 3 decision, ruled that the difference in treatment accorded these two classes was not constitutionally infirm considering the peculiar legitimate legislative purpose sought to be furthered by the scheme, *i.e.,* the affirmance and encouragement of state workers' compensation schemes. Justice Stewart writing for the majority in *Richardson* stated:

"It is self-evident that the offset reflected a judgment by Congress that the workmen's compensation and disability insurance programs in certain instances served a common purpose, and that the workmen's compensation programs should take precedence in the area of overlap.

\* \* \*

" \* \* \* The original purpose of state workmen's compensation laws was to satisfy a need inadequately met by private insurance or tort claim awards. Congress could rationally conclude that this need should continue to be met primarily by the States, and that a federal program that began to duplicate the efforts of the States might lead to the gradual weakening or atrophy of the state programs." 404 US 78, 82-84.

We are convinced that *Richardson* is manifestly distinguishable from the case at bar.

First, the United States Supreme Court's ruling

specifically relied on the Federal-state relationship and the congressional desire not to encroach upon a state program. That policy is obviously not present in the instant case.

Second, factually the two situations under comparison markedly differ. This is so in two pivotal respects.

The first significant factual distinction centers on the fact that *Richardson* concerned the set-off relationship of two non-beneficiary contributory systems from which the insured would benefit gratuitously, whereas the instant case concerns the set-off relationship of two beneficiary contributory systems. Unlike the situation posed in *Richardson,* this Court is not required to rule on a legislative classificatory attempt to eliminate redundant, free transfer payments; rather, we are faced with a manifestly distinguishable attempt to set off insured-financed governmental benefits against insured-financed private no-fault coverage.

The second significant factual distinction involves the circumstance that the *Richardson* scheme sought to set off a disability benefit against a disability benefit, whereas the scheme under review seeks to set off a longevity benefit against a disability benefit. We find this dissimilarity compelling.

Third, we find *Richardson* distinguishable in terms of the legislative purposes sought to be accomplished by the statutory schemes engineered by the United States Congress and the Michigan Legislature. Reduced to their common denominator, both schemes have as an apparent legitimate purpose the elimination of duplicative recovery. This elimination was sought to be achieved by these two legislative bodies, however, through two entirely different vehicles. Indeed, in *Richardson,*

Congress enacted a set-off provision as a vehicle to reduce the Federal government's risk on its own Federal, governmental fund. Here, unlike *Richardson,* the Michigan Legislature has enacted a set-off as a vehicle to reduce the private insurance industry's risk on a private insurance fund. In essence, the § 3109(1) scheme operates to either partially or completely discharge *private* contractual, no-fault obligations while the *Richardson* scheme operated to discharge· *public* obligations created and controlled by Congress pursuant to its general welfare powers.

On the basis of the foregoing analysis of *Richardson,* we are persuaded that the majority's reasoning and holding therein is not dispositive of the case before us as suggested by defendant.[26] We are further persuaded that the conceptual analysis offered in both *Fox* and *Bowser* is both appropriate for our present consideration and supportive of our finding of facial unconstitutionality.

## VII. DUE PROCESS CHALLENGE

Plaintiffs additionally contend that the § 3109(1) statutory scheme is facially unconstitutional as it confiscates property in the form of personally financed premium payments without due process of law. In support of this contention, plaintiffs forward essentially the same analysis as provided in their equal protection challenge to § 3109(1).

---

[26] Defendant also cites the Florida Supreme Court's decision in *Lasky v State Farm Ins Co,* 296 So 2d 9 (Fla, 1974), for the proposition that the present scheme is not violative of equal protection. Indeed, this was the result reached by that Court; we are not bound, however, by the holdings of other state supreme courts although such authority is frequently considered in our deliberations if well-reasoned and persuasive. We do not find *Lasky* to fall into that latter category of persuasiveness as the Florida Supreme Court's constitutional analysis of the set-off scheme presented for its review is devoid of policy discussion and lacks the citation of any legal authority.

Defendant similarly rests upon the same analysis it proffered to rebut plaintiffs' equal protection challenges.

We have consistently opined that the over-all objective of the No-Fault Act is to adequately, assuredly,. and promptly compensate victims of automobile accidents for certain economic losses. We have likewise determined that the statutory scheme engineered by § 3109(1) has as its permissible purpose either the elimination of duplicative recovery or the reduction of premium costs for all insureds.

It is beyond peradventure that payment of personal protection insurance benefits as well as the payment of governmental benefits under the no-fault scheme are triggered by an injury arising from a compensable automobile accident and resulting in economic loss to the insured. Yet, the broad statutory language of § 3109(1) irrationally permits the set-off of non-accident as well as accident related governmental benefits.

Indeed, the unqualified, overbroad language of § 3109(1) indicates the absurd result that not only may the insurer subtract insured subsidized accident-related Social Security benefits as here, but the insurer may also set off *e.g.,* Federal, state, municipal and employee pension and disability plans, veterans' benefits, and other non-automobile casualty related benefits paid from a governmental fund and financed by the recipient insured. No doubt, were we to hold this section constitutional, we could envision an insurer setting-off an insured's governmental pension benefits awarded because of the insured's employment longevity, against the insurer's no-fault liability for injury occasioned in an automobile accident.

It is clear from the above example that the

language of this scheme is unconstitutionally over-
broad and devoid of means rationally related to an
otherwise legitimate legislative purpose.

## VIII. CONCLUSION

We find that the elimination of duplicative bene-
fits and the maintenance or reduction of premium
costs are permissible exercises of the legislative
judgment. We are not persuaded, however, that
either the classifications drawn or the means se-
lected by the Legislature to effectuate this judg-
ment through the enactment of § 3109(1) reason-
ably relate to these otherwise legitimate govern-
mental purposes.

Accordingly, we find the statutory scheme of
§ 3109(1) to facially deny plaintiffs both due proc-
ess and equal protection of the laws.

Having found § 3109(1) facially unconstitutional,
we likewise find the contract provision invalid as
offensive to public policy. See, *e.g., State Farm
Mutual Automobile Ins Co v Shelly,* 394 Mich 448;
231 NW2d 641 (1975).

Although the Court of Appeals found § 3109(1) to
be of no effect as of the date of its enactment, we
hold that in the interests of justice our declaration
of unconstitutionality must be given only limited
retroactive effect. We, therefore, hold the ruling
announced today to be applicable to: (i) the instant
case and all lower court cases presently pending
which have raised this issue but in which a deci-
sion has not been rendered; (ii) all appropriate
future cases in which this section is disputed
subsequent to the date of this opinion; (iii) those
cases in which a retrial is to occur after the date
of this opinion because of remand on any other
issue where the § 3109(1) set-off issue has been

raised; and (iv) those cases pending on appeal or eligible for appeal after the date of this opinion in which this issue has been adequately preserved.

We affirm the Court of Appeals finding of unconstitutionality and order entry of judgment consistent with this opinion. No costs, a public question being involved.

FITZGERALD and BLAIR MOODY, JR., JJ., concurred with WILLIAMS, J.

BLAIR MOODY, JR., J. *(concurring with* WILLIAMS, J.) I agree with the general analysis employed by Justice WILLIAMS and therefore sign his opinion. However, I reserve judgment concerning the scope of the Legislature's intent to avoid duplicative recovery and any distinction between contributive and non-contributive governmental benefits.